## ACKERMAN *vs.* EMOTT and SCHRYVER, ex'rs of Van Benschoten.

Where a general power was given, in a will, to executors, to make investments of legacies, but they were not limited or restricted by any express directions as to the particular method in which the investments were to be made; but the testator directed the amounts of certain legacies given by him to a church, and to a school, to be placed and kept at interest by the officers of those societies, *on good real security;* HELD that those positive instructions in the only instances in which the testator expressly specified any particular mode of investment, were strongly indicative of his views relative to the sort of security to be taken by his executors; and that although such instructions might not be imperative upon them, yet that they gave the executors a safe and appropriate guide for their conduct.

In England, when a general power is conferred upon persons acting in a representative capacity, to make investments, they are confined, in its exercise, to *real and government securities.* And the same rule prevails in this state.

This rule will sanction an investment, in this state, by executors and trustees acting under a general power, of the moneys of the *cestuis que trust,* in loans on real security, or in the public stocks of the state of New-York, or of the United States, or in loans to the New-York Life Insurance and Trust Company.

If trustees, exercising a general power to make investments, go beyond the limits prescribed by law, in selecting a mode of investment, neither good faith, nor care, nor diligence, will protect them, in the event of an actual loss. In such cases they assume the risk, and are responsible accordingly.

Where executors and trustees were authorized to invest legacies, generally—no particular mode of investment being pointed out—and they invested the legacies in bank stock, which was retained by them long after the period when the solvency of the bank was more than doubtful; and the stock depreciated in their hands; by which a large loss was sustained by the legatees; *Held* that the executors and trustees were personally liable to make good the loss.

Trustees cannot deal in their own behalf with the funds entrusted to their charge, for the benefit of another. Accordingly, where trustees and executors invested a legacy in bank stock which was, in whole or in part, the individual property of one of them, or the proceeds (in dividends) of such property, and a loss was sustained in consequence of the depreciation of the stock; *Held* that the executors were bound to make good the loss.

The exemption of executors from liability for costs does not apply to cases where they render themselves personally liable for damages, by their own acts. There the costs follow the damages.

The mere fact that interest is not paid at the time it is made payable, does not sanction the imposition of compound interest. That is allowed only in cases of gross delinquency—of an intentional violation of duty.

Ackerman *v*. Emott.

IN EQUITY.  This was an appeal by the defendants, and
a cross appeal by the plaintiff, from a decree of the late vice
chancellor of the third circuit.  The object of the bill was to
procure the payment of a legacy by the defendants, which they
hold, as executors and trustees, under the will of Matthew Van
Benschoten.  The bill set forth that the complainant was a
daughter of Matthew Van Benschoten Ackerman, of the county
of Dutchess.  That Matthew Van Benschoten, great uncle of
the father of the complainant, did, on the 26th day of August,
1818, make his last will and testament, by which the testator,
after reciting in said will that he was possessed of personal
estate, consisting of debts due on notes, bonds, judgments and
mortgages, and that it was his intent that the moneys due to
him should remain at interest as long as the same should be
deemed secure, and the interest met, did, among other things,
direct and provide as follows, as to all notes, bonds, mortgages
and judgments, which he might hold or be interested in at the
time of his decease, he did give, devise and bequeath the same
unto his executors thereinafter named, upon trust, to pay there-
out to the several persons thereinafter named as legatees, the
respective sums therein specified, and among others to the said
Matthew Van Benschoten Ackerman, the father of the com-
plainant and nephew of said testator, the sum of $14,000, and
that interest should be paid by his said executors to the several
legatees or cestuis que trust upon their respective legacies, or
upon the respective sums therein directed to be paid to them,
on the first day of May in every year, or as soon thereafter as such
executors should have received sufficient for that purpose; but
invested his said executors with a full discretion as to the out-
standing debts, to let them remain or otherwise, in the per-
formance of his views and intent as in said will expressed;
and when and as often as they might have moneys in hand,
more than sufficient to pay the legacies or sums directed to be
paid by them, they might pay the same from time to time to
such of the legatees as they should think proper, and that said
testator did thereby appoint James Emott and John T. Schry-
ver, to be executors of his last will and testament.  That three

codicils to said will were duly made and executed. The first on the 22d day of October, 1819, the second on the 18th day of October, 1820, and the third on the 4th day of December, 1823. That said testator, by his third codicil, revoked the legacy of $14,000 to his said nephew, Matthew Van Benschoten Ackerman, and in the place thereof, gave and bequeathed $3500 to each of the four daughters then living, of his said nephew, Matthew Van Benschoten Ackerman, to be paid to them severally as they should arrive at age or on their marriage; and in the meantime the interest thereon to be paid at the discretion of said executors, for their maintenance and education; and that the testator in and by said third codicil, did in all things other than those in said codicil specified, confirm and ratify the provisions of his said last will and testament, and declared his intention to extend the same to all property by him held at the time of executing said third codicil, and that the legacies in and by said codicil given, were to be in all respects subject to the provisions and instructions of his said last will and testaments. That James Emott and John T. Schryver, as executors, caused said will and codicils to be duly proved and recorded in the office of the Surrogate of the county of Dutchess, and that on the ninth day of February, 1825, letters testamentary were duly issued to said executors. That the complainant was one of the four daughters of Matthew Van Benschoten Ackerman, mentioned in the third codicil to said will; that the defendants, as executors and trustees, about the 9th day of February, 1825, took possession of the personal estate of the testator, in value upwards of $125,000, and subsequently realized therefrom more than sufficient to pay all the debts and specific legacies of said testator; that said executors, after paying all the debts and providing for the payment of the specific legacies, set apart $3,500 to hold in trust for the complainant according to the provisions of said will, until she should arrive at age; that the complainant arrived at the age of twenty one years on the 3d day of September, 1842, and had received only a small proportion of the interest of her legacy: that after arriving at age the complainant demanded of the defen-

Ackerman *v.* Emott.

dants the payment of said $3500 and interest, according to the provisions of said will; that the defendants refused to pay the same, and instead thereof tendered to complainant, in full satisfaction for her claim under said will and codicil, the one half of four hundred and seventy-five shares of the stock of the Dutchess county bank, of the par value of $11,875, and the one half of a bond and mortgage for about $1800; that said stock was not worth more than forty per cent. The bill charged that the complainant was not bound, and ought not to be compelled, to receive said stock and bond and mortgage in satisfaction, in whole or in part, of her said claim, and to submit to the loss which she would thereby sustain. That the executors pretended that at the time of making the investment, they purchased a large portion of said stock from Walter Cunningham, who was cashier of said Bank, but that in reality it belonged to said executors or one of them, and that other portions of said stock were purchased, by said executors, of James Emott himself. That at the time of said investments the bank was in doubtful and precarious circumstances, and that this was known to the defendants; that James Emott was president and John T. Schryver also an officer of said bank; that said investments were made fraudulently and for their own benefit, or that of other persons with a disregard for the interest of the complainant; that said stock, when tendered by the defendants to the complainant, was worth only a very small part of her claim; that there was justly due to the complainant more than $8000, which the executors and trustees refused to pay in any other way than by said bank stock and said bond and mortgage. The bill prayed for an answer on oath, and that the defendants might be decreed to pay the complainant her legacy of $3,500 with interest, and for general relief.

The joint and several answer of the defendants admitted the due execution, probate, and recording of the will and codicils of the testator, and that he died about the year 1825; that letters testamentary were duly issued to the defendants as executors; and that the complainant was one of the four daughters of Matthew V. B. Ackerman, mentioned in the last codicil to the

Ackerman v. Emott.

will.   And it stated that about the 10th day of February, 1825, the defendants caused an inventory of the personal estate of the testator to be made, amounting in the whole to $125,463,29, of which sum $124,235,29 consisted of debts due the estate, which debts, with a small part of the other personal property, came to the hands of the defendants; the most of the other personal property being bequeathed to, and taken by, others. The defendants admitted that they realized out of the personal property coming to their hands more than sufficient to pay all the debts of the said testator and all the specific legacies mentioned in the will and codicils, with interest; and stated that the defendant Emott took charge of the debts due the testator as set forth in the inventory, and took upon himself the payment of the legacies; and that the defendant Schryver took no part in the settlement of the estate, other than to occasionally advise.   That the defendant Emott, between the 24th day of April, 1825, and the 19th day of August, 1831, collected and paid over all the specific legacies and the interest thereon, (except the legacy to the four daughters of Matthew V. B. Ackerman,) amounting to about $90,412,44.   That about the 1st day of January, 1834, the defendant Emott made an investment of about $13,200 in 400 shares of the stock of the Dutchess County Bank, which was taken in the names of the defendants as trustees for said four children; and that about the same time the defendant Emott stated an account for the four daughters for their legacy, adding interest up to that time, and deducting advances for them and the 400 shares of bank stock, leaving a balance in favor of the four children of $8,381,75; and that from that time, to and including the year 1842, he continued to make distribution among the residuary legatees, until the whole sum paid by him, (exclusive of said legacies to the four daughters,) amounted to $146,052,20.   That in June, 1836, Emott made a further investment in the names of the defendants, as trustees for said four children, of $4250, for 160 shares of the new stock of said bank, leaving a balance due for dividends, on the first day of January, 1837, of $1730 uninvested.   That in the fall of 1836 Helen Maria, one of said four daughters, having

died, the defendant Emott settled with her administrator in February, 1837, for her legacy, which he did by deducting advances, and transferring ¼ of the 400 and ¼ of 560 shares of stock, and paying in cash $2504,33, leaving for the surviving sisters ¾ of the 160 shares of stock, and $7512,67, the balance of dividends undistributed ; that the defendant Emott then made two other investments in the names of the defendants, as trustees of the three surviving children, of $7500 for 250 shares of said stock.   That in October, 1838, the defendant Emott, in the names of the defendants as trustees, loaned on bond and mortgage to James H. Mills, $1800, and on the 29th day of October, 1840, there remained uninvested, of dividends and interest, after deducting advances for the children, about $2073,06.   That in the year 1840, Sarah Ann, one of the three daughters, being married, the defendant Emott settled with her marriage trustees, by paying cash $1312,02, ⅓ of the 613 shares of stock, and took an assignment of ⅓ of the Mills bond and mortgage in behalf of the two remaining daughters, Phebe and Caroline, so that on the 1st day of May, 1841, there remained in trust for the two daughters 475 shares of said stock, of cash uninvested $761,04 the Mills bond and mortgage for $1800, and that said Emott had since received, as interest on said bond and mortgage, $252.   That the first investment in said bank stock (that of the 400 shares about the 1st of January, 1834,) was made by a transfer of the same by Walter Cunningham to the defendants as trustees of said four children, for the sum of $13,200, being $33 a share, and 32 per cent above par.   That the defendant Emott had an interest in the stock so transferred by said Cunningham, and that the 293 shares of said stock, in which said investment was made in Feb. 1837, was owned by said Emott and by him transferred to the defendants as trustees for the sum of $8990, (being about $30 per share and 25 per cent above par.)   That the investments were made in good faith, without any particular view to promote his own interest, and for no other motive than for the settlement of the estate and to satisfy the persons interested therein, &c. and that at the time thereof the bank was in good standing and the

stock much sought after. And the defendants denied that at the time of the last investment, or at any time previous, the bank was in doubtful circumstances or largely the creditor of individuals of suspected insolvency, or that large quantities were in the market, except new stock. And they stated that they did not believe that the stock ever sold at or below the par value, prior to 1st January, 1837; and that it sold for a premium until a considerable time after the last investment made by them as trustees. But they admitted that the stock is and was at the time of the tender to the complainant worth less than the par value, from suspension of specie payments and general derangement of the business of the country. That at the time of making the several investments, Walter Cunningham was cashier, a director and a large stockholder in said bank; that the defendants were both directors, and the defendant Emott the president of said bank; that they do not know to what amount W. Cunningham was indebted to the bank at the time the investments were made. But they admitted that they knew the general condition of the bank. They denied, however, that there was any fraud, or bad faith; or that they supposed or knew that the investments were hazardous or uncertain; or that they made the investments to benefit any other persons than the legatees. That Emott, from a knowledge of the affairs believed it was safe, and that he, at the time, and long after, was a large stockholder in said bank, and having concluded "to make the investment he had recourse to his own stock, or stock in which he was interested, not deeming it necessary to go into market, and knowing that he could reinvest for himself as he in fact did for an amount beyond such investment, and at or about the same prices." That Emott has at all times expressed a readiness and willingness to transfer to the complainant one-half of said 475 shares of stock at the price which it cost, and one-half of the Mills bond and mortgage, and to pay her any balance which remained due on her legacy in money; that the defendants were still ready to make such payment and transfer, and they submitted that the com-

Ackerman *v.* Emott.

plainant ought to be decreed to receive the same in full satisfaction of her claim.

The facts appearing in evidence in the cause, are sufficiently stated in the opinion of the court. The vice chancellor made a decree directing a reference to a master to compute the amount due to the plaintiff on account of the legacy, at simple interest, after deducting the advances made by the defendants; and that the defendants pay the amount so reported due, with costs to be taxed.

The following opinion was delivered by the vice chancellor:

PARKER, V. C. I find no evidence to warrant the belief that the defendants acted in *bad faith* toward the complainant, in investing her property in the stock of the Dutchess County Bank; and the principal question I shall examine, in deciding this case, is whether the investment thus made is of such a character as will subject the defendants to a personal liability for the loss. Upon this point there has been no express adjudication in the equity courts of this state, though I think the principle that should govern it is now well settled in England, and in some of our sister states.

It is contended by the defendants' counsel, that trustees are not responsible in regard to the preservation and care of the trust property, if they keep it as they keep their own, and that they can only be liable when they fail to exercise reasonable care and diligence. Some of the earlier decisions, doubtless, go that length, and as to many of the duties devolving upon trustees, I am satisfied this is now the law. But so indefinite and general a rule would never be sufficient to protect an infant against an unsafe investment; and on a careful examination of the authorities, I am convinced that the law regulating the investment of property by trustees is more fixed and certain. Some more definite rule is required, as well for the guidance and safety of the trustee, as for the protection of the *cestui que trust.*

In the recent case of *Clough* v. *Bond*, (3 *Mylne & Craig*, 490, 496,) Lord Cottenham says—"It will be found to be the

VOL. IV.                    80

Ackerman *v.* Emott.

result of all the best authorities upon the subject, that although a personal representative, acting strictly within the line of his duty, and exercising reasonable care and diligence, will not be responsible for the failure or depreciation of the fund in which any part of the estate may be invested, or for the insolvency or misconduct of any person who may have possessed it; yet if that line of duty be not strictly pursued, and any part of the property be invested by such personal representative in funds or securities not authorized, or be put within the control of persons who ought not to be entrusted with it, and a loss be thereby eventually sustained, such personal representative will be liable to make it good, however unexpected the result—however little likely to arise from the course adopted, and however free such course may have been from any improper motive."   Let us examine whether this is the law, and whether the stocks purchased by the defendants were an authorized security.

In *Trafford* v. *Buchin*, (3 *Atkyns*, 444,) as early as in 1746, Lord Hardwick decided that investing the trust funds in South Sea stock would not protect the trustee against personal liability for the loss; and the lord chancellor remarked that, "neither South Sea stock nor bank stock is considered a good security, because it depends on the management of the governors and directors, and is subject to losses."   And in the same case he held that an investment " in South Sea or bank annuities, where the directors have nothing to do with the principal, and were only to pay the dividends and interest, until such time as the government pay off the capital, would be a good security."   In *Hancom* v. *Allen*, (2 *Dickens*, 498,) it was held in 1774, that if a trustee lay out trust money in a fund which the court does not adopt, and such fund afterward sinks in value, the court, though there were no *mala fides*, will throw the loss upon the trustee.   Otherwise, if laid out in the fund which the court adopts.   So too, in *Peat* v. *Crane*, (2 *Dickens*, 498, *note*,) Lord Thurlow directed an allowance to be made to a trustee for the depreciation of 3 per cent. consolidated annuities, in which he had invested trust money, on the express ground that it was a fund adopted by the court.   In *Adye* v. *Feuilleteau*, (1 *Cox*,

24, *reported also in* 3 *Swanston*, 84,) decided in 1783, Lord Loughborough held that when an executor lends money of his testator upon bond, he shall be personally answerable if the security prove defective, *though* the testator was in the habit of lending money on such security. In that case it was urged by Hardinge, of counsel for the defendant, as is contended here, that the executor was not liable for losses if he did with the testator's property as a prudent man would have done with his own—that nothing short of *crassa negligentia* could make him personally liable. He cited *Harden* v. *Parsons*, (1 *Eden's Cases*, 145.) But Lord Commissioner Hotham, sitting with Lord Loughborough, added, " the court will always discourage lending trust money on private security, though large interest may be given. It becomes a species of gambling." The case of *Harden* v. *Parsons* was overruled by Lord Eldon, in *Walker* v. *Symonds*, (3 *Swanston's Rep.* 62,) and has never been relied on since as authority.

The case of *Holmes* v. *Dring*, (2 *Cox*, 1,) was decided in 1787. The executors had loaned the trust money of an infant on a bond with security. The obligors were in "ample circumstances" when the money was lent, but afterward became insolvent. The master of the rolls said that "it was never heard that a trustee could lend an infant's money on private security," and directed the executors to pay the money, and interest and costs. In *Wilkes* v. *Steward*, (*Cooper's Ch. Rep.* 6,) decided in 1801, the executors were empowered to lay out the legacy in the funds, "or in such other good security as they could procure and think safe." Yet with even this implied discretion it was held that they could not lend it on personal security. The case of *Powell* v. *Evans*, decided also in 1801, (5 *Vesey*, 838,) goes still farther. It was there held that executors who neglected to call in money, lent by the testator on a bond, should be charged with the loss that might be sustained by the subsequent failure of the obligors. This doctrine has not, perhaps, been carried to this extent in this state. The case of *Brown* v. *Thompson*, (4 *John. Ch. Rep.* 619,) may be regarded as somewhat modifying it, but I cite it to show how

strictly the. English courts have intended to guard the rights of infant *cestuis que trust.* If the rule has not been so rigidly enforced here, as to collecting money already invested by the testator, I think it has been equally strict with the English courts, in insisting upon proper investments, when made by the trustee.

It may now be regarded as the well settled rule of the English court of chancery, that the trustee can only protect himself against risk by investing the trust fund in real or government securities. He must either take security on real estate, or invest in a fund approved by the court; and no other fund is there approved by the court, except the public funds. The decisions subsequent to those I have reviewed hold the same doctrine, and make any investment on private or personal security at the risk of the trustee. (*Vigrass* v. *Binfield,* 3 *Mad.* 40. *Walker* v. *Symonds,* 3 *Swans.* 1. *Howe* v. *Earl of Dartmouth,* 7 *Ves.* 150. *Holland* v. *Hughes,* 16 *Id.* 111. *Tebbs* v. *Carpenter,* 1 *Madd.* 290.) In the case of *Clough* v. *Bond,* which was decided as late as 1838, this doctrine is recognized in express terms by Lord Chancellor Cottenham.

But it is urged by the defendants' counsel that a different rule prevails in this state, and *Thomson* v. *Brown,* (4 *John. Ch. Rep.* 619,) is relied on to show that when executors or trustees act in good faith, they will not be responsible for loss. An examination of that case, however, shows that it was not a case of investment made by the administrators. They only permitted the business to be carried on as they found it. Chancellor Kent there says, "this was not a new and distinct original trading with the assets, voluntarily entered into by the administrators. They found a store of goods in possession of a surviving partner, and they had no other alternative but either to suffer him to go on and sell on the usual terms, and under a continuation of the confidence reposed in him by the intestate, or to divide the goods and sell the share of B. at auction." Under these circumstances, it appearing that the administrators acted in good faith, they were not held liable to the loss. This case no more conflicts with the English rules regulating

Ackerman v. Emott.

the investments of trust moneys by trustees, than do the later English cases of *France* v. *Wood* (1 *Tamlyn*, 172,) and *Dorchester* v. *Effingham*, (1 *Id.* 279,) to which it is analogous. In *Brown, adm'r,* v. *Campbell, ex'r,* (*Hopkins*, 233,) notes given by the Union Cotton Manufactory to Richard F. Cooper were, by his executor, invested in stock of the Otsego Cotton Manufactory, which afterward became insolvent. This case seems to have been but little considered by either the counsel or the court, and is imperfectly stated by the reporter; and I cannot concede that it establishes any new rule on this subject. Indeed, it would appear, from the express language of the chancellor, that it was not so designed; for he says he makes the decision " without meaning that a trustee may invest the funds of his trust in stock of this kind." In the case of *Smith* v. *Smith,* (4 *John. Ch. Rep.* 281,) Chancellor Kent says, "I have no doubt that it is a wise and excellent general rule that a trustee loaning money must require adequate real security, or resort to the public funds," though, he adds, he is not prepared to say whether there are any, and, if so, what, exceptions to this rule.

I think it appears from the case of *Kirby* v. *King,* (3 *John. Ch. Rep.* 552,) that the court of chancery, in this state, has not intended to guard the property of *cestuis que trust* less sedulously than the English courts.

In New Jersey the English rule has been fully adopted. In the case of *Gray* v. *Fox*, Chancellor Vroom examines carefully the history of the law in question, and claims that it is fully established in England, and in this country. It is also recognized in 2 *Story's Eq. Juris.* 638, 641, and 2 *Kent's Com.* 5th ed. 416, *note.*

On the whole I cannot doubt but the English rule is adopted here, and that a trustee cannot be protected against a loss in investing trust funds, unless he loans on real security, or invests in some fund approved by the court. Such a rule is easily defined and readily understood, and I repeat, it is as necessary to the safety of the trustee, as to the protection of the *cestuis que trust.*

Ackerman *v.* Emott.

There is no reason operating against it here that does not exist in England. Investments can be readily made in either of the securities required, and the court approves of a deposit in the N. Y. Life Insurance and Trust Company, until a safe investment can be made on bond and mortgage. The principal of the *cestui que trust* ought not to be put in hazard. As well might the trustee invest in a commercial adventure, or in a brokerage partnership, as in bank stock. In either case the principal is hazarded, with a view to make a greater gain than the legal interest. Nor should this be left to the wide and varying discretion of the trustee. It should be regulated by some fixed and settled rule, and I know of none more salutary, that could be adopted, than that I have shown to be established. I think too, that the investment made by the defendants was not such as appears from the will to have been intended by the testator. *Interest*, not *dividends*, was directed to be paid annually. A mere *loan* was contemplated, not a carrying on of the business of banking. Most of the property of the testator was also in bonds and mortgages. The amount of bank stock was trifling in comparison. The intention of the testator should have been observed. (*Hoxie* v. *Hoxie*, 7 *Paige*, 187.)

If the view I have taken of the law is correct, it is decisive of this case, and it will not be necessary to examine the question whether the defendant Emott, individually, could transfer the stock to himself and Schryver as trustees, so as to bind their *cestuis que trust.*

The decree must therefore direct a reference to a master to compute the amount due complainant on the legacy, at simple interest, deducting the advances made by the defendants, and that on the coming in and confirmation of the master's report, the complainant have execution for the amount so reported due, with costs of suit to be taxed. *Caffrey* v. *Darby*, (6 *Ves.* 488,) is in point as to costs."

The defendants appealed from the whole of the decree of the vice chancellor; and the plaintiff appealed from that part thereof which directed that the interest to be computed on the legacy should be simple interest at seven per cent; and from all such.

parts as limited the right of the plaintiff to the recovery of simple interest only.

*G. Gifford & Geo. Wood*, for the plaintiff. I. The complainant is entitled to a decree, that the defendants pay to her the legacy of $3500, with interest from the 10th day of January, 1825, until paid, less $439,43, paid for her maintenance and education. The will directs, " that interest be paid to the said several persons and societies for the said legacies, on the first day of May in every year, or as soon thereafter as my said executors shall have received sufficient for such purpose." The third codicil of the will directs $3500 to be paid to the complainant, on her arriving at age, or on her marriage, and interest in the meantime to be paid in the discretion of the executors, for her maintenance and education; and declares that this legacy is in all respects to be subject to the provisions and instructions of the will. The intention of the testator must be followed, as nearly as it can be arrived at, from a consideration of all parts of the will. (*Hoxie* v. *Hoxie*, 7 *Paige*, 187. *Scott* v. *Ray*, 18 *Pick.* 360. *Roberts on Wills*, 477, 428. 1 *P. Wms.* 423. *Gray* v. *Minethrope*, 3 *Ves.* 105.) II. There should be annual rests, and the interest allowed on the legacy should be compound interest. The will expressly directs that interest shall be paid on the first day of May in every year. If this had been done, and the express direction of the will been complied with, of course the interest would have been added to the principal each year, and accumulated with annual rests. The defendants themselves understood that the legacy was to accumulate by compound interest, as appears from the fact that they first invested a part of it on bond and mortgage, and added the interest to it; and also from the fact that they have, from time to time, invested what dividends accrued on the bank stock. III. As the decree now stands, the complainant will not receive interest on the accumulations, even since the commencement of the suit, and while the cause has been pending on the appeal of the defendants. Whereas, if the defendants had not wrongfully refused to pay when the complainant ar-

Ackerman *v.* Emott.

rived at age, she could have invested the amount then due, including principal and interest, and received the increase. The decree should therefore be so altered as to prevent this loss to the complainant. IV. Investment in bank stock was contrary to the intention of the testator, and contrary to his practice in his lifetime. (1.) Contrary to his intention; because, he directs in his will, that *interest* shall be paid on the first of May in each year, &c. and says nothing about dividends or income; and (2.) Though the executors were invested by the will "with a full and ample discretion, as to the collection of outstanding debts, to let them remain or otherwise," yet such discretion was limited by the terms of the will, to what was in furtherance of the views and intent of the testator. (3.) It was contrary to his practice, as appears from the inventory of his personal property, which shows that of personal property which he possessed at the time of his death, to the amount of $125,463,97, $1228, 68, consisted of farming utensils, &c. $10,883,78, of notes, bonds, accounts, and cash, $750 of Middle District bank stock, and $112,601,51, of bonds and mortgages. V. The complainant is a legatee to receive a specified sum, and must be paid in preference to the residuary legatees; and if the executors have lost a part of the property of the estate, for which they are not personally liable, the residuary legatees must sustain the loss, and not the specific legatees. VI. Strict diligence and care is required of executors and trustees, and particularly where the *cestuis que trust* are infants. (*Jeremy's Eq. Juris.* 149, 158. 2 *P. Wms. Rep.* 215.) And this, even where investments are made on real security. (*Stickney* v. *Sewall,* 1 *Mylne & Craig,* 1.) VII. An investment of trust funds in bank stock by executors and trustees, without express power is given them to do so, is a breach of trust, and they are personally liable for the loss which may result from such investment; because (1.) It is placing the funds where they do not draw interest, or any other certain income. (2.) It is endangering the principal by embarking it in a speculative operation. (3.) Bank stock is mere personal property, and executors cannot invest trust funds therein, without incurring the liability for all loss. (*Trafford* v.

*Boehm*, 3 *Atk.* 439, 444. *Howe* v. *Earl of Dartmouth*, 7. *Ves.* 150. *Hancom* v. *Allen*, 2 *Dick.* 498, *and cases there cited.* 16 *Ves.* 114. *Gray* v. *Fox*, *Sexton's Ch. Rep.* 268. *Smith* v. *Smith*, 4 *John. Ch. Rep.* 281, 4, 5.) (4.) If trustees or executors lend or invest trust money on private and personal security, they are liable for the loss resulting from the failure of such security. (*Clough* v. *Bond*, 3 *Mylne & Craig's Rep.* 490, 496, *and cases there cited.* 2 *Kent's Com.* 5th ed. 416, *note.* *Jeremy's Eq. Juris.* 146, 156, 157, *and note l.* *Adye* v. *Feuilliteau*, 1 *Cox's Rep.* 24. *Holmes* v. *Dring*, 2 *Id.* 1. *Lawton* v. *Copeland*, 2 *Bro.* 156. *Perkins* v. *Boynton*, 1 *Bro. C. C.* 375. *Ryder* v. *Bickcerton*, *Eden's Rep.* 149, *note.* *Trafford* v. *Boehm*, 2 *Dick.* 498. 3 *Swanston*, 80; *notes.* *Powell* v. *Evans*, 5 *Ves. jun.* 844. *Wilkes* v. *Stewart*, *Coop. Cases*, 6. *Walker* v. *Symonds*, 3 *Swanston's Rep.* 1. *Gray* v. *Fox*, *Sexton's Rep.* 259. *Smith* v. *Smith*, 4 *John. Ch. Rep.* 281, 284. 2 *Story's Eq. Juris. p.* 514, 517, 636.) (5.) It is against the policy of the law to invest in bank stock. (2 *R. S. N. Y. ed. of* 1836, *p.* 31, § 48; *also p.* 37, § 80.) (6.) Courts of equity have never, in any way, recognized bank stock, or the stock of any other private company, as sufficient security for trust funds. The courts have deposited moneys in the New-York Life Insurance and Trust Company, because that company was to a great extent under the control of the chancellor, and its capital was required to be invested in bonds and mortgages; showing how particular the legislature and the courts were to prevent the funds being at the risk of ordinary banking companies. (*See Charter of the Company, Laws of* 1830, *ch.* 75, §§ 7, 18; *Rules of Court of Chancery*, 128.) VIII. An investment in bank stock is not even taking personal security; but it is employing the funds in speculating business, the same in principle as establishing and conducting a sole banking association or a broker's office with the funds, or purchasing an interest in the business of a private copartnership. It is not even taking the personal obligation of the borrower, with the stock as collateral. IX. Trustees are personally liable for losses when they have used the funds in business or speculating;

whether they have so used them for the benefit of themselves, or for the benefit of the *cestui que trust.* X. All of the stock, except 40 shares of new stock, tendered to the complainant by the defendants, was purchased (if purchased at all) by James Emott, of himself. XI. Executors and trustees cannot purchase the property of the *cestui que trust,* or sell their own property to the *cestui que trust,* or contract with themselves for the *cestui que trust,* particularly where the *cestuis que trust* are infants. This is a well established rule both in England and in this country and state. (*Chitty on Cont.* 295 *notes. Ex parte Lacy,* 6 *Ves.* 625. *Ex parte Hughes,* 6 *Id.* 617. *Lester* v. *Lester,* *Id.* 631. *Ex parte James,* 8 *Id.* 337. *Ex parte Bennett,* 10 *Id.* 385. *Randall* v. *Errington, Id.* 423. *Morse* v. *Royal,* 13 *Id.* 355. *Lowther* v. *Lowther,* 7 *Id.* 95. *Walford* v. *Adie,* 5 *Hares' Ch. R.* 112, 123. *Wormly* v. *Wormly,* 8 *Wheat. R.* 435, 441. *Prevost* v. *Gratz,* 1 *Pet. C. C. R.* 368. *Church* v. *Marine Ins. Co.* 1 *Mason's C. C. R.* 344. *Stapp* v. *Faber,* 3 *Bibb's R.* 451. *McClanahan* v. *Chambers,* 1 *Monroe's R.* 45. *Davoue* v. *Fanning,* 2 *John. Ch. R.* 257. *Munroe* v. *Allaire,* 2 *Caines' Cas. in Er.* 183. *Rogers* v. *Rogers, Hopkins' R.* 524. *Torrey* v. *Bank of Orleans,* 9 *Paige* 663. *Hawley* v. *Cramer,* 4 *Cowen,* 736. 1 *Paige,* 393. 3 *Id.* 198. *Walter* v. *Harris,* 7 *Id.* 168. *Chapin* v. *Weed, Clarke's Ch. R.* 46. *Jackson* v. *Van Dolfsen,* 5 *Johns. R.* 43. *Litchfield* v. *Cudworth,* 15 *Pick.* 30.) "The character of seller and buyer can never be united in the same person." (6 *Pick.* 198. 7 *Id.* 119. 3 *Binney,* 54. 4 *Id.* 43. 2 *Wharton* 63. *Falls* v. *Torrence,* 4 *Hawks,* 412. *Connor* v. *Jenkins,* 1 *Dev. Eq. R.* 422. *Gordon* v. *Finlay,* 3 *Hawks,* 241.) "One administrator cannot purchase of another." (*Obert* v. *Hamnell,* 3 *Harrison's R.* 81.) "Executors cannot contract with themselves." (*Weight* v. *Cutter,* 2 *Hals. R.* 179. *Banks* v. *Judah,* 8 *Conn. R.* 145.) XII. The defendants are chargeable with legal fraud, and with negligence, for investing the legacy in the stock of the Dutchess County Bank, and allowing it to remain in the manner they did. There has been no time since the fall of 1835, when the men who had

Ackerman *v.* Emott.

the same, or similar knowledge of the affairs of the bank, as James Emott, have considered the stock a safe investment. Dutchess County Bank stock was sold in 1840, in Poughkeepsie, at auction, for 80 cents on a dollar; and in 1842, for 40 cents on a dollar. The stock bought by Emott as trustee, of himself, was at a higher price than it was generally selling, at that time. It was for 132, 130 and 120 cents on the dollar. XIII. The defendant Emott did not take as good care of the legacy of the complainant as he did of his own property. XIV. There has never been any valid sale or transfer of the stock to the complainant. The attempt of the defendant Emott to sell his own stock to himself, for the complainant while an infant, was null and void, and there was therefore in fact and law, no investment in behalf of the complainant. (*Chit. on Cont. 5th ed.* 295.) And the position of the defendants is that of a mere refusal to pay, with the funds still in their hands. XV. The complainant is entitled to costs. The defendants have committed a breach of trust with the funds of an infant. XVI. Both defendants are liable. The defendant Schryver admits that the acts of Emott were done with his concurrence.

*S. Sherwood,* for the defendants. I. The defendants were executors of Matthew Van Benschoten deceased, and the complainant was a specific legatee under the will, of $3500, payable when the complainant arrived at age, which was the 3d of September, 1842, with interest; with a discretion as to advances for maintenance. And in this respect the defendants were trustees. II. It was the duty of the executors to invest the legacy in such manner as to make it productive, during the minority of the legatees, of whom the complainant was one. III. The defendants invested the funds for these legacies with some others, in the stock of the Dutchess County Bank, in which bank the defendants were directors, and the defendant Emott was president; he also holding a large amount of stock, and was generally a very large depositor. IV. The stock always paid a dividend of rising of 8 per cent, until 1840. And

Ackerman *v.* Emott.

a large surplus was on hand, the stock ranging from 115 to 140. V. The vice chancellor erroneously decided that the defendants were not authorized to invest the funds for the Ackerman legatees in the stock of a bank, and could only invest on bond and mortgage, or in some fund approved by the court. There is no settled rule in this country upon the subject of investments, other than the general rule that trustees are bound to invest the funds in such manner as a prudent man would invest his own moneys. In this case the defendants acted in good faith. And the court would have authorized the investment made by them, if leave had been applied for.

*By the Court,* STRONG, P. J. The testator, by the third codicil to his will bequeathed to the plaintiff $3500, to be paid to her when she should arrive at age, or marry ; and directed that in the meantime the interest on such legacy should be paid, in the discretion of the executors, for her maintenance and education. The whole personal estate of the testator was bequeathed to the executors, in trust for the purposes specified in the will; and the plaintiff's legacy was given subject to its provisions and instructions. Although the defendants were not in terms authorized to invest the legacy for the benefit of the plaintiff, until she should become entitled to the payment of the principal, yet the power to do so was necessarily incidental to the direction for the payment of interest for her benefit, in the meantime. The principal question in this cause' is, whether the power to make such investment was unlimited, or restricted by any provision in the will, or by any rules applicable to persons acting in a representative capacity.

The codicil by which the plaintiff's legacy was given, extends the will to all property then held by the testator; and directs that all the legacies bequeathed in such codicil shall be in all respects subject to the provisions and instructions of the will. There are no instructions in that instrument for the investment of money by the executors; but the testator expressed a wish that the persons owing him should not be oppressed or harassed, it being his intent that the money due to him should

---

Ackerman *v.* Emott.

---

remain at interest "as long as the same should be deemed secure, and the interest met." He, however, directed that the amounts of certain legacies which he bequeathed to the trustees of the Reformed Dutch Church at Hackensack, and the trustees of the school at the same place, should be placed and kept at interest *on good real security.* Those investments were to be made by the officers of the societies, and were to be continued for indefinite times. The testator may therefore have deemed it necessary to give more stringent directions for their security than where a similar power was conferred upon his executors, who doubtless had his entire confidence, to be exercised within a comparatively short period. But still such positive instructions, in the only instances in which he expressly authorized any investments, are strongly indicative of his views relative to the requisite security; and, although possibly not imperative upon the executors, yet gave them a safe, and in my opinion, appropriate guide for their conduct. And these considerations are the more forcible where, as in this case, there are instructions given in two instances, and those the only instructions in the will, for the security which should be required on the investment of moneys under its provisions. And it is expressly declared in the codicil that the legacies therein given are in all respects to be subject to the provisions and instructions of the will.

It seems to be settled by many cases in the courts in England, and indeed was admitted by the counsel for the defendants on the argument, that where a general power is conferred upon persons acting in a representative capacity, to make investments, in that country, they are confined in its exercise to *real* and *government securities.* The cases quoted by the late vice chancellor are conclusive on that point. In some of the cases it is said that trustees are not personally responsible if they exercise the power confided to them in good faith, and with reasonable care and diligence. But that applies to cases where they do not go beyond the limits prescribed for them by express rules. If for instance, in making a loan on real security, they in good faith take that which is apparently sufficient at the time,

and it eventually turns out to be inadequate, they will not be responsible for any loss that may be sustained. So also in the selection of government securities. But if they go beyond the prescribed limits, neither good faith, nor care, nor diligence (if they can accompany such departure) will protect them where there is an actual loss. In such cases they assume the risk and must be responsible accordingly.

But it is contended that the rule has never been established in this state; and that it would be oppressive to enforce it against persons acting in good faith, until it had been fully settled, and become generally known. It is probably a sufficient answer to say that it has long been the uniform rule in the country from which we derive, and in many cases by constitutional provisions, the principal rules for our conduct. We have no other foundation for a vast proportion of the principles which govern our actions, both in our individual and representative capacities. All this must have been well known to the principal and more active trustee in this cause, (who has been an eminent member of the bar, and filled a prominent judicial station,) at the time when the trust was assumed. Possibly in extreme cases, and particularly where some rule is based upon principles inconsistent with the nature of our institutions, such rule should be declared inapplicable, and not in force. But this is neither the one nor the other. The rule is highly beneficial both for the trustee and *cestui que trust*. The trustee knows that he is safe so long as he acts honestly, and confines himself within the prescribed limits. The interests of the *cestui que trust*, who is ordinarily incapable of guarding his own rights, are securely protected. His property cannot be jeoparded and wasted by hazardous speculations. In a great majority of cases speculations in this country have been productive of disastrous consequences, even to those who have acted in their own behalf. Besides, if persons acting for others are authorized to speculate with the funds of those whom they represent, the temptation is strong, in case of success, to assume the advantage personally, or in case of loss, to throw it upon the *cestui que trust*. Experience has shown that there

Ackerman v. Emott.

are many who cannot resist the temptation. It is undoubtedly true that in a few instances investments for *cestuis que trust* in speculative stocks have proved very advantageous to them. They have obtained a high interest for their money, and a great advance of the principal fund. But the law regards the certainty of an income for persons thus situated, more than its magnitude. Sometimes it is all they have to depend upon for their subsistence, and they are incapable of acquiring any thing by their personal exertions. It may sometimes happen that it will be difficult to invest moneys in either of the requisite securities, at the usual rate of interest or income. In such cases trustees would be justified in loaning or investing funds at a less rate, or, in extreme cases, in retaining them for a short period. But ordinarily, if a judgment may be formed from the past, there will be no difficulty in procuring a safe investment in some of the appropriate securities. The danger of giving an unlimited discretion to trustees and others acting in a similar capacity is strongly illustrated by the facts in this case. If it could be safely entrusted to any one it surely might be to one of the defendants (Judge Emott) whose high character for probity and intelligence is so well and favorably known. And yet the discretionary power which he has assumed in this case has resulted in the depreciation of the property intrusted to his management to probably less than half its value.

The rule established in England has not been abrogated or altered by any legislative action in this state. Nor has it been impaired or affected by the decision of any of our courts, if indeed it could be changed by judicial authority. In *Brown* v. *Campbell*, (*Hopkins' Rep.* 233,) which was cited by the defendants' counsel, Chancellor Sanford sustained the exchange of the notes of the Union Cotton Manufactory for the stock of the Otsego Cotton Manufactory. That however was not an original investment of money, but simply the exchange of one doubtful security for another, and might have been the best arrangement which could have been made. The chancellor expressly disavowed any intention to decide that a trustee might invest the

Ackerman *v.* Emott.

funds of his trust in such stocks as were taken by the executor in that case. In *Smith* v. *Smith*, (4 *John. Ch. Rep.* 281,) which was also cited by the defendants' counsel, Chancellor Kent directed that the ward should receive the unsecured promissory notes taken by his guardian from persons who were solvent at the time, *and who continued to be solvent to the taking the account before the master.* There was no actual loss in that case; and the chancellor declared that in adopting that course, he meant to be understood that if a guardian or trustee loans money without due security, he must be responsible in case of insolvency. And he further said that he had no doubt "that it is a wise and excellent general rule, that a trustee loaning money must require adequate real security, or resort to the public funds." He subsequently qualified this by saying that he was not prepared to decide whether any, and if any, what exception may exist to the general rule on this point. The doubt expressed by the chancellor in that case has probably given rise to this controversy. And that consideration shows the propriety and expediency of uniformly adhering to fixed and settled rules. Surely he could not have intended to admit an exception which would in effect abrogate the rule altogether. In *Eckford* v. *De Kay*, (8 *Paige*, 89,) Chancellor Walworth decided that where the guardian had invested the funds in which his ward had an interest, in the purchase of real estate, without the previous sanction of this court, she would of course have the right, when she came of age, to repudiate the deed, and to claim her share of the funds, and interest, from the estate of her guardian, or from his sureties. These cases, so far from attempting to repudiate the English rule, would seem to recognize the expediency of retaining it, in this state. That would sanction the investment of the moneys of the *cestui que trust* in loans on real security, or in the public stocks of this state or of the United States, and also, under the rules of this court, in loans to the New-York Life Insurance and Trust Company. As the investment in this case was not in either of these securities, but was in fact in a fund of a precarious character, and retained long after the period when its

safety was more than doubtful, it cannot be sustained; and the defendants are for that reason personally responsible to make good the loss.

But there is another ground equally fatal to the validity of this transaction. The stock purchased by the defendants was in whole or in part the individual property of one of them, or the proceeds (in dividends) of such property. It has long been settled, and upon principles which cannot be controverted, that a trustee cannot deal in his own behalf with the funds intrusted to his charge for the benefit of another. He can neither purchase the trust funds for himself, nor exchange them for his own property.

The defendants also contend that they should be exempt from the payment of the costs. Where executors are made responsible in their representative capacity for acts done by their testator, reasons of public policy exonerate them from personal liability for adverse costs. But the exemption ought not to, and does not, apply to cases where they render themselves personally liable for damages, by their own acts. There the costs follow the damages.

The decree of the late vice chancellor, so far as it relates to the appeal of the defendants, must be affirmed.

The plaintiff has appealed from the same decree, on the ground that the defendants were charged only with simple interest. It is contended that inasmuch as the will requires that the interest shall be paid annually on the first of May, and as it has never in fact been paid, it should be charged on each instalment, from the time when it was made payable. But the interest was not directed to be paid to the plaintiff annually. On the contrary, the third codicil directs that it shall be paid at the discretion of the executors, for her maintenance and education. But the fact that interest is made payable on a particular time (which is usually the case) does not sanction the imposition of compound interest. It is allowed only in cases of gross delinquency—of an intentional violation of duty. (11 *Vesey*, 92. *Hopk. Rep.* 424.) I have carefully read over all the testimony in this cause to ascertain whether it presents such a case. I

am satisfied that it does not. The executors, although one of them labored under gross, and under the circumstances singular deceptions, appear to have acted from honest motives, and with a disposition to promote the interests of the plaintiff. They have made a mistake which renders them personally responsible; but they suffer sufficiently for that, by being compelled to make the consequent loss good, and to pay the costs of the suit instituted for that purpose.

The decree of the late vice chancellor of the third circuit must be affirmed in all respects, and, pursuant to a mutual agreement made on the argument, with costs of the two appeals to be paid equally by both parties.

---

NEW-YORK GENERAL TERM, November, 1848. *Hurlbut, McCoun, and Edwards*, Justices.