SCHUCHMAN, J., concurs.

_____

(23 Misc. Rep. 211.)

In re FIDELITY LOAN, TRUST & GUARANTY CO. et al.

(Surrogate's Court, Erie County.    March, 1898.)

1. EXECUTORS—DEALINGS WITH TRUST PROPERTY.

Where the majority of the stock and bonds of a railroad company belonged to an estate, and the executors elected one of their number president of the road, fixing his salary at the same amount as was paid the president during the lifetime of deceased, they are entitled to allowance for their proportion of the amount paid for such salary.

2. SAME—SALES TO PAY DEBTS.

It is the duty of executors to convert the estate into cash for the payment of claims against it, and where they sell shares of stock at the market price to pay debts of the estate, and such stock afterwards increases in value, they are not liable for mismanagement.

Objections by Matilda M. Satterfield to the intermediate accounts of the Fidelity Loan, Trust & Guaranty Company and Henry C. McCormick, executors of the last will of John Satterfield, deceased. Overruled.

Rogers, Locke & Milburne, for executors.

Norris Morey, for Matilda M. Satterfield, contestant.

MARCUS, S.    Objections have been filed to the accounts presented by the executors, which, for convenience, may be divided into four groups, as follows:    First, items of expenditures relating to the Williamsport & North Branch Railroad; second, salary of vice president of such road; third, sale of the Standard Oil Trust stock and Natural Gas Trust stock; fourth, items of expenditure relating to the Boise City & Nampa Irrigation Land & Lumber Company.

The objections relating to the expenditures of the executors on account of the railroad property must be dismissed for want of testimony.    There is no evidence from which a conclusion can be reached that the executors, who practically represent the management of the road, should be refused credit for payments and expenses made by them which are charged to be extravagant and unwarranted.    Nor does the testimony show them to have been lacking in care and diligence in the management of the railroad affairs. The fact that the net earnings have steadily decreased is satisfactorily explained.    The bark and timber in the country through which the railroad runs, and where tanneries formerly flourished, have become to a great extent exhausted, and it would appear that a large amount of the business in previous years was drawn from such sources.    The road was built to act as a connecting line between two great branches, in which purpose it seems to have failed by reason of a change in the management of the roads with which

the connections were expected to be made.    The road, as at present constructed, runs from Hall, Pa., to Satterfield, Pa., a distance of 48 miles, and was built in the lifetime of the testator, and has in no way been extended by the executors.    The testimony shows that only such repairs were made as were absolutely needful.

A more serious objection has been urged against the payment of $5,000 per year (one-half of which has been borne by this estate) to Mr. McCormick, as president, and afterwards to Mr. Forman, as vice president, of the same road, upon the theory that the executors thereby reap a personal advantage from their position by so dealing with the trust property.    It is admitted that the payments of salary have been actually turned over by Mr. Forman to the Fidelity Company, one of the trustees, under the will of this estate.    My first impression was with the contestants, since it would appear as if a larger commission were ultimately thereby received by the executors than the law directs or allows; but, from a careful consideration of the question, the legal effects of the acts complained of do not seem to be in any way discordant with the law of trusts.    At the time of Mr. Satterfield's death, he and Mr. Hascal L. Taylor owned nearly all the stocks and bonds of the Williamsport & North Branch Railroad.    A few bonds were outstanding in the names of other parties.    Prior to his death a system of management had been inaugurated, including a president, a superintendent, and a treasurer or auditor.    The salary of the president was fixed at $5,000. Mr. McCormick continued, as president, in receipt of this salary, until he entered upon the duties of the office of attorney general of the state of Pennsylvania, which was in the early part of 1895. When Mr. McCormick resigned as president, Mr. Forman was elected vice president, and the management of the road was put into his hands.    He could not be elected president, because, under the laws of the state of Pennsylvania, the president of a railroad operating exclusively within that state must be a resident thereof.    After his election, it was arranged by correspondence between the directors that he should have the same salary as his predecessor.    Since his election he has been the executive head of the company, and has managed its affairs, and was therefore an officer of the road.    The board of directors was elected annually by the stockholders, appearing either in person or by proxy.    The stock of the Satterfield and Taylor estates was voted by proxy.    The rule that the law does not permit a trustee to assume relations inconsistent with his trust does not seem to have any application to these facts.

The recent case of Elias v. Schweyer, 13 App. Div. 336, 43 N. Y. Supp. 55, seems effectively to sustain the claim of the executors. An action was brought for the removal of the trustee of an estate. A portion of the trust estate consisted of a majority of the stock of a brewery company.    One of the trustees manipulated the voting power of that stock so as to elect himself a director and president of the company, with a large salary attached thereto.    The court said:

"Most of the criticisms made upon the defendant relate to his conduct as president of the brewery corporation; and, if this were justified, then the remedy to apply would be to exclude him from the directorship and presidency

of the corporation. We do not mean to infer that the facts proven will justify such a judgment, because it was seemingly the duty of the trustees of the estate stock to be represented in the board of directors, and no valid ground is assigned why one of the trustees should not be at the head of the affairs of the company. It is questionable, however, whether a trustee, if so elected as president, should receive any salary, because it appears that the discretion is vested in the trustees to sell the stock should an advantageous opportunity occur; and one who is in receipt of a large salary might be unconsciously biased in his judgment when the question was presented between his own interest in retaining such salary and the interests of his cestui que trust, which might be promoted by a sale of the brewery. As it was not shown that the receipt of such salary in the past has in any way affected an advantageous disposition of the brewery, any future injury to be apprehended from this cause could be obviated by adjudging that, if elected president, he should receive no salary as such."

The court clearly stated (13 App. Div. 341, 43 N. Y. Supp. 58) that it did not determine this point about salary, leaving it for determination on the new trial, as an open question to be decided in accordance with testimony to be then produced.

There is no evidence that Mr. Forman's salary as vice president "has in any way affected an advantageous disposition" of the railroad property. The case is authority for the position that, even if Mr. Forman had been the executor of this estate, it would have been proper for him to have been a director and president. It would therefore seem that the election of Mr. Forman as vice president of the railroad company was entirely proper, indeed prudent. There was no duty incumbent on the executors to run the railroad, because among the assets of the testator were many bonds of that road. Their duty was complete by simply holding the stocks and bonds, voting thereon, and receiving any interests or dividends that might be paid. There was no obligation on the executors to manage the affairs of the railroad because the estate was a large holder of stocks and bonds. The management of its affairs was entirely different and separate from any duties the Fidelity Company and Mr. McCormick were called upon to perform as executors and trustees. Mr. Forman having rendered his services as vice president, and having been paid a salary which was fixed by Messrs. Taylor and Satterfield in their lifetime (and it seems to have been a fixed amount since the inception of the road), there is no warrant for depriving him of that compensation, or the Fidelity Company to which he turned over the salary, it not being shown that the receipt of the salary has affected the sale of the road or of its stock. It is also to be noted that Mr. Forman is not the executor of this estate, but only an officer of the executor, the Fidelity Company, which is a corporation, and, in contemplation of law, an entirely distinct person from its officers or stockholders. The fact that Mr. Forman turned his salary over to the Fidelity Company in no way changes the status of affairs, since that was purely voluntary on his part. The trust company had no legal claim to it, nor was Mr. Forman under any obligation so to dispose of it. Nor does the fact that it was so paid affect his legal claim to the salary as between himself and the railroad company, or as between him and the stockholders of the company. The salary was payable out of the funds of the railroad company, and

was a charge to be deducted before the net income was ascertained, and to that net income only is this estate entitled as bondholder and stockholder. It was an obligation of the railroad company, and not of this estate. The duties performed by Mr. Forman not being in any sense the duties of the executors, the salary so earned by him cannot be deemed extra compensation. Again, the Fidelity Company alone is not even the sole executor, since Mr. McCormick, though perhaps not particularly active, is nevertheless executor and trustee on an equal footing, and his action is as necessary in all matters as that of the Fidelity Company.

It has been urged that the case is the same as though the trustee were an individual instead of a corporation; that since the Fidelity Company received all sums which nominally were paid to Mr. Forman in his official capacity as vice president, and which have gone to swell its assets and increase the value of its stock, the reasons which would affect the action or bias the judgment of an individual would have the same effect on the board of directors. If there was any evil in such a condition, the remedy is the same for an individual as a corporation, but the evil does not seem to exist. It must be apparent that the executors should have representation in the management of this road, and, since it was possible to obtain control of this corporation as to its direction, it needs no argument to prove the wisdom and sense of such a course, rather than to have allowed its guidance to be in the hands of strangers to the welfare of this estate.

The sale by the executors and trustees of the stock of the Standard Oil Trust and the Natural Gas Trust, it is contended, was made unnecessarily and improvidently, was in violation of the plain duty of the executors and trustees under the will and the law, and ought not to be approved or justified. It has been urged that, if this estate had been administered carefully, diligently, and providently by some competent person who had acquainted himself with its affairs and with the purpose of the will, for the benefit of the widow and the children, the debts would now be all, or nearly all, paid, and those stocks would now be in the hands of the executors, producing a handsome income for the legatees. It has been further urged that the chief end of the will, to wit, the forming of three income-producing funds from the securities owned by the testator for the three legatees, appears not only to have been lost sight of, but to have been made almost impossible, in that it has been substantially defeated by reason of the sale of the stocks mentioned. In brief, the position taken by the contestants is that the stocks mentioned should never have been sold, since they were large interest-paying stocks, but rather other assets in the hands of the executors should have been converted. The sale of the Standard Oil stock, although when sold bringing the highest market price that had been reached up to the dates of sales, which was at all times under 200, coupled with the fact that it has since reached 400 and upward, is the cause of much irritation to the contestants. As the entire estate subject to the payment of debts in the course of administration was to be held for the benefit of the legatees to be converted into money, as the interests of the

estate required (article 7, will), and as all securities held by the testa-
tor were set aside by the will, and the executors released from liabil-
ity for their depreciation (article 8, will), it is contended that the
executors would have been justified, and, by the strongest implica-
tion, were required to hold for the legatees these extraordinary se-
curities which were paying 2½ to 3 per cent. per quarter, which had
never paid less, and whose success and credit were at their highest
point. When Mr. Satterfield died, in April of 1894, he owed $384,-
045.91, consisting of notes payable, $200,000; indorsement on notes,
$8,498; accounts, $909; mortgages, $53,613.43; balance of the sub-
scription to the Pecos Company, $65,025. With the notes there
were pledged, as collateral, 750 shares of the Standard Oil Trust
stock, 371 shares of the Natural Gas Trust stock, and other securi-
ties. The evidence shows that, as to the larger portion of these
notes, the executors were notified that they must be paid. The
inventory shows that the only available securities of any account on
hand for the payment of debts were the Niagara Falls & Suspension
Bridge Railway Company bonds, $39,500; the Third National Bank
stock, $38,520; the Northwestern & Ohio Natural Gas stock, $34,110;
the Fidelity Trust & Guaranty Company stock, $54,600; the Natural
Gas Trust stock, $42,665; and the Standard Oil Trust stock in ques-
tion. As there was collateral up for the notes, and payment was
insisted on, they had to be paid, and the executors were entirely
warranted in selling the available securities of the estate to provide
the means of paying them as they fell due. Any obligations they
gave after that, in renewal of them, would be only personal obliga-
tions, as executors cannot bind the estate by new contracts. There
was no duty resting upon them to keep on pledging the securities
of the estate, and keep the indebtedness of the estate running at 6
per cent. The direction of the statute is that the executor should
"proceed with diligence to pay the debts of the deceased." No ex-
ception whatsoever could have been taken to the conduct of the
executors if they had sold the available securities of the estate,
including the Standard Oil Trust stock, at the time the notes fell
due, to provide the means for paying them, as payment was neces-
sary, in view of the right of the creditor to realize on the securities
pledged for their payment. For the relief and advantage of the
estate, that more time might be had in which to realize favorably on
the securities, the executors took up the notes, as they matured, with
the funds of the Fidelity Company, and held them as liabilities of
the estate, to be actually retired, as available securities of the estate
should be sold. The primary duty of the executor is to get in the
estate and pay the debts; that is, to convert the available securities
to an extent necessary to pay the debts. To allow the debts to run
at 6 per cent. while there were available securities which could be
sold, and the proceeds used to pay the debts, would expose the execu-
tors to liability for loss arising from such an operation. The execu-
tors were not bound to make the advances to take up the notes as
they matured. They, however, during the year 1894, advanced to
the estate the sum of $223,142.92. They could not let this indebted-
ness run along indefinitely. The duty was to pay it,—to convert the

available assets into money with which to pay the indebtedness. What securities should be converted was purely an executorial duty, and called for the "intelligent and honest action of the executors," and, unless it is shown that such action was not in good faith, it cannot be criticised.

The contestants strenuously urge that, since the Fidelity Company had already made the advancements to assist and relieve this estate, they should have continued without selling the stocks in question to repay themselves, and to have waited a more opportune time for the final disposition of the stocks in question. As subsequent events have shown, such a course would have been of enormous benefit to the estate. But the question now before us is whether these executors, by reason of their failure so to do, can be held for maladministration. Manifestly, they cannot. To have carried along this large indebtedness, drawing 6 per cent. interest, when there were available securities which could be applied, after conversion, to its payment, would, I believe, justly have subjected them to liability and a charge of maladministration. Again, if the stocks in question had depreciated instead of so marvelously appreciating, it is doubtful whether the question would have been raised at all. It does not seem to me that there was any other way in which to pay the debts of the testator excepting by the sale of marketable securities, and the designation of such securities for sale was a matter for the executors to determine, "acting honestly and in good faith, and with reasonable prudence and discretion." While extra dividends in 1896 and 1897 raised the price of this stock, there was no way in which they could be expected or foreseen. Where an executor, in due course of administration and in the exercise of reasonable care, sold certain railroad stock which had depreciated in his hands, it was held that he was not liable to the estate for the loss sustained, although the market value of the stock afterwards increased. In re Green, 37 N. J. Eq. 254. If these executors and trustees had received money from the estate which, under the will, it would have been their duty to invest, and they had purchased the stock in question, they certainly would have been personally liable had there ultimately been a loss upon the transaction. Ackerman v. Emott, 4 Barb. 626. It does not seem to me that the executors and trustees need depend on the speculative character of this stock as a justification of their course or as a matter of wisdom, since, apart from their legal right to sell the same for payment of debts of the estate, the will contained no directions what should be done with the stock, nor any provision forbidding its sale. Hence they had a right, acting in good faith, to sell the same, and reinvest the proceeds in securities authorized by law. "The rule in England and in this state which forbids a trustee to invest funds in the securities of railroads and other corporations is a most salutary one; and we think the rule is, or ought to be, that a trustee who receives trust property, invested in securities, should, if he is not required to sell the same, at any rate have the right to make such sale and invest the proceeds, in the same manner that he would be required to do if trust property received by him were money." Toronto Gen. Trusts.

Co. v. Chicago, B. & Q. R. R. Co., 64 Hun, 1, 18 N. Y. Supp. 593; affirmed 138 N. Y. 657, 34 N. E. 514. But I prefer to dispose of this branch of the case by resting upon the proposition that it is the duty of executors to convert the personal assets of an estate into money for the payment of debts. The condition of estates sometimes strongly commends the advancement of money where debts, perhaps bearing heavy interest, are to be paid, and the immediate reduction of the real or personal property into ready cash, to meet such payments, might be attended with serious loss; yet I have been unable to discover any authority making such advancements a duty incumbent upon executors. The advances made by the Fidelity Company to this estate from May 21, 1894, to September 19, 1894, amounted in all to the sum of $223,142.92. Subsequently there was advanced on and after January 23, 1895, $35,000, making a total of $258,142. The repayment of those advances began on the 14th day of January, 1894, the last payment being on April 22, 1897. The times of the sales of the Standard Oil Trust stock began November 10, 1894, the last sale being made on the 14th day of January, 1896. It would therefore seem that there was no haste, but rather ample deliberation in the sale of the stock, and likewise in the payment of the indebtedness.

The objections to the expenditures relating to the Boise City & Nampa Irrigation Land & Lumber Company present to my mind the weighty and troublesome question of this contest,—serious because of the large amount involved; embarrassing by reason of the legal question arising. Mr. Satterfield, in his lifetime, in conjunction with Mr. Taylor, became involved in this Idaho canal and land matter. On February 15, 1894, the canal was sold at the instance of Taylor and Satterfield, on execution, and was bought in by them. It consisted of a main irrigation canal, with various lateral canals. Prior to that time they had acquired several thousand acres of land in the vicinity of the canal. They had bought 6,000 acres, and had under contract 6,000 acres more, on which they had paid $2 per acre. The only testimony of what Mr. Satterfield's original investment was is given by Mr. Forman, from the books of Mr. Satterfield, at the sum of $74,047. Doubtless, Mr. Taylor's investment was the same, but there is no testimony to that effect. When Messrs. Taylor and Satterfield acquired control of the canal, a Mr. Greene, who had been connected with them in other business enterprises, was placed in charge, and he has been continued in office by the executors at an annual salary of $3,500. He is the manager of the company, and the man upon whom the executors have entirely relied. The inventory in this court shows the appraisal of the Boise City property at $15,012. The appraisal of the same property in the probate court at Boise City was taken at about $435,000,—$371,000 for the canal, and the balance for the land. It is hard to reconcile these valuations on the same property. Mr. Foreman testified that there has been paid out, on account of the Boise City matters, $60,325.36. At a public sale made of this property, for the purpose of defeating a second mortgage and perfecting the title, the canal property was recently sold on a foreclosure for $13,000, and was bid in by Mr.

Greene for the benefit of this estate and Mr. Taylor. The total expenditures from March, 1894, to August 5, 1897, were $184,170, and the total income from the canal for the same period was $81,789. The difference was supplied by the executors of this estate. These expenditures, according to the contention of the contestants, were all for enlargements and improvements in widening and enlarging gates, including their supports and foundations, deepening the canal, constructing new ditches, building warehouses and telephone lines; while, according to the accountants' theory, they were solely for the purpose of preserving the property, and were strictly in the line of repairs to maintain it in proper condition, that it might be kept adapted to the purposes for which it existed.

It is urged by the contestants that the executors were not justified in sending $60,000 and upward to Idaho for the purpose of protecting property appraised in the inventory at $15,000, especially in view of the fact that, since the $60,000 has been expended, the canal has been sold at a public sale for $13,000; that the expenditure was an investment, pure and simple; that, in this alleged squandering of money, they have violated the fundamental duty of the trust; that that which they were set to preserve they have put at hazard, with all the chances against them; and that that which they were bound to use either in paying debts, or creating a fund bringing income to the legatees, they have sent beyond their own reach and the reach of this court, where it cannot be recalled or applied to either purpose. The executors answer that they could not permit the portion of the estate to go to waste for the lack of necessary repairs, and that they did only what was essential to the preservation of the trust property; that they were bound to preserve the property in such condition that it should be kept adapted to the purposes for which it existed; that the condition of the property warranted and justified any expenditure made thereon; and, with the improvement of the times, that there will be a sale of it which will make a handsome return to the estate, and justify everything that has been done by them. Many other arguments have been presented and reasons assigned on behalf of both parties why this account should and should not be allowed. I have concluded to dispose of this branch of the case without determining, at this time, the merits of the questions presented. The canal venture is still an open one so far as this estate is concerned. The accounting before me is only an intermediate one, and only shows the receipts and disbursements with reference to the canal property up to a given time. It is therefore impossible now to determine the final state of the canal account when it shall be closed by a sale. The executors may feel justified in expending still further money upon its maintenance, and the amount to be eventually realized may make it entirely unnecessary to pass upon the alleged abuse of discretion.

All the figures involved in this heavy transaction, from its beginning to its close, should be before the court in making a final disposition, especially where the administration of this estate will, in any event, have to run for many years, making an immediate disposition of matters growing out of a continuing enterprise unim-

portant. I am free to say that, with the sworn appraisement made for these executors by disinterested appraisers, of $15,012, in mind, and the obviously speculative character of this venture from the outset, it may be doubtful whether an expenditure by the executors of $60,000 and upward—over four times the estimated value of the canal—for its preservation was justified. If this transaction were now fully closed upon the basis of the figures presented, it would be a question, deserving of careful consideration, whether the court ought to relieve the executors from liability for what now appears to have been the exercise of poor judgment, their good faith not being assailed. It may be that the outcome of this venture will place the matter in a more favorable light to the executors, and it would seem fairer to all parties concerned to postpone the final disposition of this portion of the accounting until the canal account is closed. The executors may therefore be allowed credit at this time upon all items connected with the canal property, the same to be allowed, nevertheless, without prejudice to reopening their consideration in future accountings. Decreed accordingly.