## Hogan *vs.* De Peyster, administrator, &c.

A testator directed his real and personal estate to be converted into money, as soon as convenient, and the proceeds to be securely invested in the most productive manner; leaving it, however, to the *discretion* of his trustees to suffer such part of his personal estate as was then invested in bank stock to remain in that state, so long as they might *deem it most for the interest of the testator's family.* At the time of his death, in January, 1836, the testator held 1000 shares in the stock of the Bank of the United States. The charter of that bank expired March 4, 1836, and on the 18th of February, 1836, the state of Pennsylvania chartered " The United States Bank," an institution designed to take the place of the former; and by arrangement between the two banks the stock of the former national institution was transferred to the new bank. The new bank subsequently failed, involving nearly a total loss to the stockholders. *Held* that the administrator, *cum testamento annexo*, did not render himself liable for the loss upon the testator's stock, merely by *suffering* such stock *to remain* in the state it was in at the testator's death, and to pass, as the rest of the stock did, to the new bank; or by receiving the dividends upon the new stock.

IN EQUITY. This suit was originally commenced in the late court of chancery. The bill was filed to recover of

the defendant as administrator and trustee, the difference between what certain bank stock actually sold for, and what it *should have been sold for* by the defendant, in the performance of his duty as administrator *ad colligendum*, administrator with the will annexed, and as trustee.

John Clendenning died, leaving a will, and a large estate and family, and the defendant, Frederick De Peyster, was appointed, first, administrator *ad colligendum*, and afterwards administrator with the will annexed. He filed a bill for the construction of the will ; and a decree adjudging its meaning, and appointing the defendant trustee, was made by the chancellor, and affirmed by the court of errors. A part of the testator's estate consisted of the stock of the Bank of the United States, which the defendant permitted to be converted, subsequently, on the expiration of the bank charter, into the stock of the United States Bank, chartered by the state of Pennsylvania, which stock, thus converted, became of comparatively little value, and was sold at low prices ; and the plaintiffs here seek *to recover the loss sustained* on that part of the said stock which belonged to Mrs. Hogan and her children.

*L. R. Marsh,* for the plaintiffs. I. It was the duty of the defendant to have sold the stock of the National Bank, converted it into money, and brought it within the jurisdiction of the courts of this state, and invested it either in the public funds, or on the security of real estate ; those being the two modes of investment of trust funds recognized and sanctioned by the courts. The general principle contended for in this point is well settled. (2 *Wms. on Ex'rs,* 1110, 1111. 1 *Mad.* 298. 5 *Ves.* 839. 5 *Pick.* 96. *Ackerman* v. *Emott,* 4 *Barb.* 626.)

II. But *when* should the defendant have sold this stock? The testator died 28th January, 1836. About ten months afterwards, 19th November, 1836, the defendant was appointed administrator *ad colligendum*, the charter of the national bank having expired in March preceding, (4th March, 1836.) His duty as such administrator, perhaps, did not call upon him to sell, but only to collect and keep safe. But, on the 4th of Feb-

ruary, 1837, the defendant was appointed administrator *cum testamento annexo.* (2 *R. S.* 72, § 22; *vol.* 2, *p.* 258, § 22, 4*th ed. Conklin* v. *Egerton's Adm'r,* 21 *Wend.* 430; *S. C. on appeal,* 25 *id.* 224. 8 *Paige,* 310, 311.) In the opinion, in the case of the bill filed for a construction of this very will, the chancellor said, " The administrator with the will annexed is probably entitled to execute all the trusts of the will, in the same manner as if he had been named therein by the testator, as the executor and trustee." But inasmuch as there might be some doubt whether, as such administrator, he could convert the real estate into personalty, he provided, in that decree, for the defendant's appointment as such trustee. The chancellor, in 1840, in the case of *Egerton's Adm'r* v. *Conklin,* 25 *Wend.* 235, before cited, says, that in the above remark in 8 *Paige,* he referred " to the right of the administrator, with the will annexed, to execute the trusts of such will in relation to the real estate of the decedent." By the general law, therefore, applicable to administrators with the will annexed, (21 *Wend.* 433, and pages cited by *Cowen,*) and by the above statute, the defendant, on the 4th February, 1837, when he received the letters of administration *cum,* became, at least as far as regarded the personal estate of the decedent, vested with all the rights and powers, and subjected to all the duties and responsibilities of an executor and trustee. He was, therefore, unless otherwise excused, under the duty, immediately after Feb. 4, 1837, of selling the stock of this national bank, the charter of which had expired a year before. He is, therefore, we say, liable for the difference between its then or highest value afterwards, and the sum for which he subsequently actually sold it. This amount may be the subject of reference, if the principle is decided. Then, on 8th June, 1840, the final decree was made in the case commenced by the defendant, to obtain a construction of the will; and, as doubts had arisen as to the defendant's power as administrator *cum,* to convey real estate, he was then appointed trustee under the will. Now, if there could have been any doubt as to the defendant's duty as administrator *cum,* in reference to this bank stock, there could certainly be none, under his appointment as

trustee, on and after June 8, 1840. Besides, additional obligations were imposed on him, by the request of Mrs. Hogan to him to sell at different times. Now what are the defendant's alleged excuses or defenses? 1st. He says the testator, by his will, left it "to the discretion of my said trustees to suffer such part of my personal estate as is now invested in bank stock to remain in its present state so long as they may deem it most for the interest of my family." We answer: (1st.) That this was a discretion which the testator chose to bestow upon the three persons he had named as trustees. It was not a discretion that attached to the office of trustee, whoever should hold it. Besides, the obligation to sell, attached to the defendant as administrator *cum*, before his appointment as trustee. 2d. But this bank stock did not remain in the state in which it was at the testator's death, after the expiration of the charter of the national bank, and especially after it became converted into the stock of the state institution of Pennsylvania. The testator died 28th January, 1836, the will having been executed seven years before, to wit, 22d July, 1829. The words were really written in 1829, though they take their legal date and existence January 28, 1836. The charter of the bank expired March 4, 1836, and the defendant was appointed administrator *cum* 4th February thereafter. When he took this administration, therefore, that part of the testator's estate which was invested in the stock of this bank, was not in the same state it was in at the testator's death. Even, therefore, if the discretionary clause of the will applied to the defendant, in his character of administrator *cum*, yet he could derive no excuse from it for not selling the stock immediately upon receiving such letters, because of the great change which had taken place in the investment. The testator left it a productive stock of a living corporation. The defendant found the charter expired, and the corporation defunct. Not only this, but the testator left it invested in the stock of a national bank, and the defendant, as administrator, found it changed into the stock of a state bank, and allowed it to remain there. The testator left it in a sort of public funds, and the defendant permitted it to enter and remain in a private corporation. The defendant says

that the stock was specifically bequeathed by the will to the trustees named therein, in trust for the uses and purposes therein mentioned, and the defendant, as administrator, had no power to sell. (1.) These trustees renounced. The defendant was appointed administrator *cum*. This was with all the powers and obligations of such an administrator generally. He was then either trustee to carry out the will, which directs the conversion of all his estate, real and personal, into money and proceeds invested ; or, as administrator *cum*, he was, in the exercise of the duties of that office, obliged to call in this investment. According to the defendant's doctrine, inasmuch as the whole estate was thus bequeathed, the administrator *cum* had nothing to do, and was a useless appurtenance. The chancellor, in the case before cited, says : " The administrator, with the will annexed, was probably entitled to execute all the trusts of the will, in the same manner as if he had been named therein by the testator as the executor and trustee." By the renunciation of the trustees, the estate did not vest in them ; and all the duties of exercising diligence to secure the estate, required of executors and administrators generally, devolved upon the defendant when he was appointed administrator *cum*. (2.) If there were any force in this idea, advanced by the defendant, it altogether ceased when he was in point of fact appointed trustee in June, 1840. (3.) The defendant says, that he permitted it to remain invested as aforesaid, with the knolwedge, approbation and consent of the complainant, Wm. Hogan, who acted, as defendant believes, for himself and wife, and guardian of the other complainants. We reply : (1st.) There is no evidence of this—no proof, any where, that either Wm. Hogan, Sarah Hogan, or either of the plaintiffs, assented to the continuance of this investment in this stock. (2d.) But if there were any evidence of any assent of said William Hogan to the continuance of this investment, it would have no effect in excusing the defendant, or lightening his responsibility. The defendant was the administrator, and bound to do his duty. Wm. Hogan had no authority to assent for Mrs. Hogan, or the infant children. He was not general guardian of the children, but only *ad*

*litem* in the suit for construction of the will. The defendant says that the plaintiffs are barred from any recovery herein, by reason of his various accountings before the master. Now, the evidence on this subject is : The report of Master Codwise, which was merely on an order requiring him to divide and distribute the property in his, defendant's, hands, amongst the heirs. It had not the slightest connection with any liability the defendant might have theretofore been subjected to, by reason of any neglect of duty. The other accountings were merely of incomes. And the final accounting was also only of income. It was not an accounting of any damages to which the defendant might be liable for neglect of duty. That was not within the province of the master. It is not pretended that any thing was ever paid therefor. If he was ever liable, nothing was done on these accountings, to the adjudication, payment, or waiver of any such demand. They never went beyond the accounting for moneys actually received and paid out, or invested, or pretended to be invested, within the respective periods. They took no cognizance of the inventoried assets of the estate, or the value of stocks, or the liability of the administrator *cum*, or the trustee, growing out of omissions or commissions.

*Murray Hoffman*, for the defendant. I. It is conceded that the defendant had no power in the premises, so long as his character of administrator *ad colligendum* existed.

II. It was not in the power of the defendant, as administrator with the will annexed, to sell the stock. It was only when he was appointed trustee, under the decree of June 8th, 1840, that this power was acquired. In the opinion given by Mr. Hogan, October 21st, 1840 this is clearly and positively insisted upon.

III. But supposing that, as administrator, the defendant possessed ample power, he was fully justified in omitting to sell the stock, and holding the new stock in the state bank, as its substitute. (1.) It must be carefully noticed that he did not do *any act* to effect a change or substitution of the stock. All that he did was so far to recognize it, as to receive the dividends which

were paid. And these were divided, and paid away among the parties entitled to the income of the estate. (2.) The suffering a substitution of the stock was a justifiable and proper exercise of the discretion given to the trustees by the will, or necessarily vested in them by the law. The second clause of the will authorizes the trustees to suffer such part of his personal estate as was invested in bank stock to remain in its present state, so long as they should deem it for the interest of his family. It is matter of history, that the failure of the bank to obtain a recharter was known as matter of fact, and certainly before the testator's death. That identical stock could not be expected to remain in its then state. The testator had numerous parcels of stock of other banks. Hence this clause of the will is either wholly inapplicable, or it sanctions the continuation of an investment in bank stock at the trustees' discretion. But the plaintiffs in their points insist, that the discretionary power therein given, was vested in the three named trustees, and did not attach to any new trustee. Admitting this, it follows that the power did not vest, and the clause is not applicable to the defendant, as administrator with the will annexed. His duty and liability are to be determined upon general principles, irrespective of the clause, which did not apply either to him, or to stock situated as this stock was when he became such administrator. Was it, then, in the exercise of an honest discretion to leave the stock in the new bank? Most of the stockholders of the old bank took or retained the stock in the new. They became stockholders in the new bank without any action of their own, but by force of the act of Pennsylvania merely. The late Mr. Watts, described by the witness Kearney as a very shrewd man in stocks, retained the shares in the new bank. Prior to the suspension of specie payments, and from March to July, 1836, the market value of the state bank stock was from 120 to 126. After the resumption in May, 1838, and from June to July, it was 120 to 123. In November, 1839, the defendant considered the investment in such stock good, on behalf of his son, who took some under Mr. Watts, and wished not to sell. The continuance of the stock in the state bank, was with the

approbation of every one interested who was competent to assent or approve. They were aware of it; they received the dividends in the share of income which was divided among them, and allowed the defendant to pass his accounts before the surrogate, and before Master Codwise, without objection, protest or cavil. In October, 1839, a meeting of some of the parties in interest took place, when the propriety of selling the stock was discussed. One of the parties thought it ought to be sold. Mrs. Clendenning left it to defendant's best judgment. No one requested it to be sold. Mrs. Kearney states that she has heard the testator say he would not keep his stock if the charter was not renewed. This evidence was duly objected to, and clearly is inadmissible. But it is singular, indeed, that it was not communicated to the defendant, at that or some other meeting, as a strong inducement to operate upon him. The acts of the parties in 1840, after the decree of the court of chancery declaring the rights of the parties under the will, are of great importance. On the 27th of July, 1840, Mr. Hogan writes to the defendant, stating that by the decree in June preceding, he, the defendant, had now power to act in relation to the stock, which no one had before, and calling his attention to the point, whether it was stock of the old bank or of the new. Then followed the opinion of Mr. Hogan, carefully considering the questions, dated the 21st of October, 1840, and the letter to the defendant of the 28th of October, 1840. The interviews and correspondence of the defendant with Dunlap and others, ensued. The letter of Mr. Hogan of the 23d of September, 1841, refers to them, and shows that, in the opinion of the counsel of the bank, the decision of the majority of the stockholders bound the rest, and effected the change of the stock. Then followed the letter of the parties to the defendant, and the consequent opinion of Mr. Wood. The failure of the bank was about August, 1841. During the period, then, from July, 1840, to December, 1841, there was an attempt zealously and wisely carried on to establish, that the stock in question was stock of the old bank, and not of the new, and a sale during such attempt would have completely defeated it; and it is absurd

to imagine that any one could have called for it. At a meeting stated by Mrs. Kearney to have taken place in October, 1840, the subject was discussed. One or two wished a sale—none required it. It was plainly left to the judgment of the defendant, and his opinion was acquiesced in. No trustee, placed in an embarrassed position as to a claim very complicated, ever acted in better faith, or more honestly fell into an error of judgment. As to authorities, it is sufficient to refer, for the general principle, to Story's Equity, &c. But the case of *Gray* v. *Lynch*, (8 *Gill*, 404,) is entirely decisive of the present case as far as the judgment of the highest court of another state can influence it. There the testator owned stock in the old Bank of the United States. He gave authority to vest in good and safe stocks. The executors and trustees assented formally to the substitution of the stock of the state bank. It was sought to make them responsible for the loss, and the court dismissed the bill. I will not quote the points or reasonings of the court. The case deserves full consideration. I close in the closing language of the opinion, " That if, under such circumstances, a trustee was made responsible by this court, it would deserve any other title than that of a court of equity." This bill should be dismissed with costs.

*Marsh*, in reply. I. The defendant, in his first point, takes it for granted that we do not claim to hold him liable as administrator *ad colligendum*. This is not so, unless his duty as such administrator, to collect and securely hold the estate, was consistent with his permitting it to depreciate, become changed into worthless securities, and fade away.

II. The defendant, in his second point, says that he, as administrator with the will annexed, had no power to sell the stock ; but he cites no authority for this proposition, resting it solely on his own assertion. But we have shown, in the plaintiff's opening points, (point 2,) that the defendant had such power; that the general law recognized its existence in him; that the revised statutes confirm it; and that the chancellor, in considering this very will, (8 *Paige*, 310, 311,) held that the

defendant, as such administrator, had power to execute all the trusts in the will, and consequently to dispose of the stock in question. The duty to sell is expressly enjoined by the will. This order and discretion is mandatory, imperative, absolute. It lies at the bottom of the whole matter, always excepting the legal obligation and duty of the administrator to realize effects, independently of any order. The defendant says that it is insisted in the opinion given by Mr. Hogan, that the administrator had not such power. This opinion, even if it were correct so far as regarded the execution of certain trusts, assuredly did not apply to the ordinary action of the administrator for realizing and securing the estate; that was his proper, independent duty, whatever disposition of such estate might afterwards be made. But whether or no, what has this opinion, gratis, in 1840, to do with the action or non-action, or neglect and default of the defendant, through 1837-8-9? He was already in fault and delinquent, an afterward given opinion could not save him from the consequences of antecedent acts or omissions of acts.

III. The defendant, in his third point, contends that even if he had the power, yet he was fully justified in omitting to sell the stock, and in holding the new stock in the state bank as its substitute. (1.) He endeavors to establish this point, in the first place, by saying that the defendant did not do any act to effect the change or substitution of the stock, except by recognizing it. This very recognition of the change or substitution thus admitted, was an adoption of it, equivalent to an actual original participation. It was not necessary that he should do any act towards effecting the change, to make him liable. A neglect to do his duty, that is to say, to withdraw the funds from their precarious and unsanctioned position in the state bank stock, and invest them under the authority or in accordance with the principles of the New York courts, involved the same responsibility, as positive wrongful acts. (*Vide the authorities cited under the plaintiff's 2d point, viz : 1 Madd. 298 ; 5 Vesey, 839 ; 5 Pick. 96 ; 4 Barb. 626 ; N. Y. Legal Obs. 10, p. 321, an English essay, and cases cited therein.*)

(2.) The defendant, in his second subdivision of his third point, contends that the. suffering a substitution of the stock was a justifiable and proper exercise of the discretion given to the trustees by the will, or necessarily vested in them by law. We have anticipated and answered this point, in the first subdivision of the plaintiff's second point of the opening argument. The defendant says, in sustaining this proposition, that the second clause of the will authorizes the trustees to suffer such part of his personal estate as was invested in bank stock, to remain in its present state, so long as they should deem it for the interest of his family. But it is obvious, that when it became converted from the stock of the national institution, with all its guards and checks and guarantees, into stock of the state bank, which was obliged to abstract and contribute several millions of its capital to state improvements, by way of purchasing its charter, the said personal property, thus metamorphosed, did not remain in its then "present state," and the discretion of the defendant, if any he had, became annulled. That the stock in the national bank "did not remain in its present state," so as to come within the discretion given by the will, when it was changed into the state bank stock, is patent on the face of the charters. The first bank, with $35,000,000 capital, was held to the extent of one-fifth by the government, and had its aid and support. The second bank was not connected with the government, but was opposed by it; and out of its capital was required to pay $2,000,000 bonus, to loan about $6,000,000 on disadvantageous terms, and to subscribe to a variety of companies of uncertain character and doubtful results, large amounts of stock, without any control over the action or management of such companies. No discreet man would consider stock in the second bank to be in the same state as stock in the first bank. The defendant argues that the testator knew, before his death, that the national bank had failed to obtain a recharter, and that consequently this particular clause of the will, giving the trustees discretion to allow such of his personal estate as was invested in bank stock, to remain in its then present state, applied to other bank stocks, of which he held a number, and

was inapplicable to this stock.   It is evident that the discretion given by this clause of the will, does not cover the state bank stock, the sale of which is absolutely within the terms of the positive order to sell.   Of course, then, as the defendant shows that the clause of the will from which he seeks to draw his discretionary power has no application to the present case, the argument on that point would seem to be ended.   The defendant says, that if the discretion did not vest in the trustee, the power to sell did not.   But the order to sell is not a power, technically so called, or trust, or connected or entangled with any trust, but a naked order; and its fulfillment gives the means to execute the trusts, and to administer the estate.   Besides, the law, independent of the explicit order, devolved on the administrator the duty to sell.

The defendant contends that it was in the exercise of an honest discretion to leave the stock in the new bank; because most of the stockholders of the old bank took or retained their stock in the new.   We reply: (1.) That the judgment of the old stockholders is not the criterion adopted by this court.   If they had chosen to sell their stock and invest the proceeds in the personal obligations of Mr. Biddle, it would have been no justification for a similar action by the defendant with these trust funds. (2.) Those stockholders who permitted their stock, by going into the new bank, to be devoted to the internal improvement of Pennsylvania, exercised their discretion very injudiciously; for, as Mr. Robbins says, in the part of the evidence cited by the defendant, it "was very much to their subsequent regret." (3.) It was not a matter of discretion with the defendant at all. He was bound, with all diligence, to rescue the funds from the grasp of this cotton-speculating, bonus-paying, reckless-loaning institution of Pennsylvania, and invest them at home, according to the modes sanctioned by our courts.   The defendant says that the stockholders of the old bank became stockholders in the new, without any action of their own, but by force of this act of Pennsylvania merely.   We reply:

(1.) The sanction of silence, and the subsequent recognition of the new bank, were tantamount to positive affirmative action,

and charged with the same responsibilities. (2.) We hold the defendant liable for not having interfered, affirmatively, and by withdrawing the funds, prevented them from passing into the state bank.

The defendant says that the continuance of the stock in the state bank was with the approbation of every one interested who was competent to assent. We reply : (1.) If it was so it would not, surely, justify the defendant, so far as those who were not competent to assent were concerned. No one had authority to assent for them. The order to sell—the duty to sell—were imperative. The consent of Mr. Hogan that it should remain, if given, which is denied, would not alter the duty of the administrator, or lessen his liability. He was not, by the terms of the will, a consenting party ; his interests, too, were adverse to those of the *cestuis que trust*, and as for the infants he was only guardian *ad litem*, and not *in rem*, not of their property interests. (2.) But we have shown, in the plaintiff's opening point 2, sub. 3, that the above proposition of the defendant is not correct in point of fact.

The defendant alleges that the parties who were competent to assent were aware that the stock had been changed. This would not justify the defendant as to those not competent to assent. The question is not what knowledge some of the *cestuis que trust* may have had, but what was the legal duty of the defendant as such administrator and trustee. That duty did not depend upon the knowledge of those for whose benefit he held the fund. The defendant says that they received the dividends in the share of income which was divided among them, and allowed the defendant to pass his accounts before the surrogate and master without objection. The *cestuis que trust* received, doubtless, whatever the trustee chose to pay them as dividends ; but whether they knew where they came from, is neither apparent nor important. Such receipt did not adjudicate and settle any question relating to the defendant's negligence. The accountings, as by reference will appear, embraced only the moneys received from income, sales of lapsed shares of estate, and amounts paid in on account of principal for re-investment.

No examination was had as to the value of the investments of principal, whether made by the testator in his lifetime, or by the administrator since. Such accounting for 1000 shares of stock merely extended to the production of the certificates of stock. Nothing is therein stated as to liability for not converting into money at the proper time ; that was not the province of the master. Besides, the bill in this case was filed before such accounting, and the matter was before the court, and not before the master.

The defendant urges that no trustee, placed in an embarrassed position as to a claim very complicated, ever acted in better faith, or more honestly fell into an error of judgment. We reply : (1.) There was not the slightest complication about the matter. The defendant's duty was very plain—no turnpike plainer ; simply to sell the stock and invest the proceeds under the sanction of the court. It is the duty of the administrator to gather into his hands and realize the personal property of the estate, so as to have it ready for distribution according to law—or, application under a will. How simple is this proposition ; it is the fundamental principle of administration ; it is common sense, it is justice, it is law. Parties who are absolute owners of stocks, may indulge in speculative ideas of future and contingent values ; not so an administrator. (2.) It is not necessary to a recovery that the defendant should be proved to have acted dishonestly. If he chose to swerve, though from the best motives, from that plain path of duty and entire safety prescribed for administrators and trustees, the risk of loss is upon him. No better illustration of this principle could be found, than in the case cited from 4 Barb. 626, where the court, taking pains to testify to the high character and integrity of Judge Emott, yet held him strictly to the rule.

The defendant's search has brought to light one case, (8 *Gill*, 404,) which he thinks is entirely decisive of the present. He seems to have forgotten that in that case the express direction of the testator to invest in stocks took the case out of the very rule of equity on which we rely. No such authority was given by the will of Mr. Clendenning. It is, besides, to be remarked

Hogan *v.* De Peyster.

of this case in Gill, that the Maryland law is loose in regard to the duties of executors, administrators and trustees, never having adopted the English rule. This is sufficiently evident from the opinion of Dorsey, J., who, in delivering the judgment of the court, remarks: "In the course of the argument of the various points relied on in this case, to charge the defendant with the loss complained of, an immense mass, both of English and American authorities, have been referred to, to prove that, in the states or country where those decisions were made, an investment of a trust fund by executors, guardians or trustees, in bank stock, was a breach of trust, and subjected those by whom it was made to all the losses and casualties resulting therefrom. In answer to these authorities it might perhaps be sufficient to say, that the English chancery rule in regard to the securities in which trust funds can only be legitimately invested, has never, literally or analogically, been extended to Maryland; and that the American authorities cited, for the most part depend on statutory enactments of the state in which those decisions have been made, or rest on principles sanctioned by the courts of those states, but which have never been adopted, directly or indirectly, in the state of Maryland." Magruder, J., in his dissenting opinion, arrives at a conclusion more in accordance with right, and with English and American law. He says: "I must, however, think that the loss here to be sustained, ought to be borne by men who undertook the trust and then transcended the bounds of their trust duty," &c.

IV. It will be perceived that the defendant does not any where contend in his points and argument that he was not liable as trustee for not having sold the stock immediately upon his appointment as such. His main argument consists of the various divisions and subdivisions under and in support of his third point, which is that, "supposing that as administrator, the defendant possessed ample power, he was fully justified in omitting to sell the stock," &c. And yet we had contended, in our second opening point, that even if the defendant was not liable in his capacity of administrator, he surely was as trustee.

V. On the whole, then, we say it is the duty of an adminis-

trator to collect, realize, and hold securely, the personal estate of the decedent, so that it be ready for distribution; or, in case of a will, for application under the directions of such will. An order in such will that he should so realize and convert into money, if it do not strengthen and enforce the obligation already imposed on him by the law of administration, certainly takes away any reason for favorable consideration in the event of injury through his neglect.   The defendant was appointed administrator *cum testamento annexo,* Feb. 4, 1837; in Feb. 1838, he had become derelict from duty, and so continued through 1838, 1839, 1840, and throughout.   His responsibility and liability accrued and was conclusive upon him in 1838.   No after correspondence, no requests or non-requests, or refusals of requests, no after given opinions, correct or incorrect, in 1839, 1840, or any after time, of parties interested or not interested, agreeing or disagreeing, of distributees or *cestuis que . trust,* (all infants,) can be urged in palliation of a plain neglect of duty, in 1837 and 1838.

*By the Court,* MITCHELL, P. J.   The testator made his will in 1829, and died January 28, 1836.   On the 4th of February, 1837, the defendant was appointed administrator with the will annexed.   The testator, at his decease, held 1000 shares, of $100 each, in the stock of the Bank of the United States—the National institution.   The charter of that bank expired on the 4th of March, 1836.   On the 18th of February 1836 the state of Pennsylvania chartered " The United States Bank," the institution of that state.   This last institution was intended to take the place of the former, and it was generally supposed that it would do so, to a great extent; those who disliked the first extending an equal dislike to the second, and those who had confidence in the first generally reposing an equal confidence in the second.   The testator, by the second clause in his will, directed his real and personal estate to be converted into money, as soon as convenient, after his decease, and the proceeds to be securely invested in *the most productive* manner, "leaving it, however, to the *discretion* of my said trustees to *suffer* such part of my

personal estate as is now invested in *bank stock* to remain in its present state, so long *as they may deem* it most for the interest of my family." The testator must specially have referred to this stock, as it formed a large part of his estate, and especially of the part invested in bank stock. He must have known what his will was, in the month when he died, and that this discretion applied to this stock; and he must also have known that the national institution would not then probably be rechartered. He must therefore be considered as sanctioning the continuance of this stock either in the same bank if re-incorporated, or in one substantially similar, or which might be regarded as in some sense its successor. If congress had rechartered the same bank, the case would have been clear. If it had chartered a new institution on a similar plan, with a right to subscribe open to all, and by arrangement between the new and old banks this subscription had been transferred to the new, his intention would probably have been that such transfer should be made. Here the difference was that a state institution took the place of the national one, and by arrangement between them the stock was thus transferred. There was no more reason to apprehend loss from the institution having a state charter than from its having a national one. The executors, therefore, could not be charged with any breach of duty in not interfering to prevent (if they could have prevented) this arrangement between the two institutions, or in not claiming payment of the value of their stock from the old institution. The defendant did nothing to aid the transfer, and when asked to take measures to make the old bank liable (as he had not assented to it) no proof is shown that he did not take a course satisfactory, at the time, to the plaintiffs. He was advised by counsel that it was inexpedient to attempt such a suit after dividends had been accepted from the state institution. The administrator barely *suffered* the stock to remain in the state in which it was at the testator's decease, and to pass as the rest of that stock did, except the part subscribed by the United States; and then, finding it so transferred as by a common consent of the stockholders, he received the dividends

on the new stock. This was not a new investment by him. The case of *Ackerman* v. *Emott*, (4 *Barb.* 626,) shows the distinction between the two cases, and that an executor is liable for an unauthorized investment by himself, on personal securities or bank stock, but admits that he is not liable for permitting such investments made by his testator, to continue. Parker, V. C. says, (*p.* 635,) the case of *Powell* v. *Evans*, (5 *Ves.* 838,) held that executors who neglected to call in money lent by the *testator* on a bond, should be charged with the loss that might be sustained by the subsequent failure of the obligors. He adds, " this doctrine has not perhaps been carried to this extent in this state. The case of *Thompson* v. *Brown*, (4 *John. Ch. Rep.* 619,) may be regarded as somewhat modifying it." " If the rule has not been so rigidly enforced here, as to collecting money already *invested by the testator*, I think it has been equally strict with the English courts, in insisting upon proper investments, when made by the trustee." " An examination of that case, (*Thompson* v. *Brown*,) however, shows that it was not a case of investment made by the administrators. They only *permitted* the business to be carried on as they found it. Chancellor Kent there says, ' This was not a new and distinct original trading with the assets voluntarily entered into by the administrators. They found a store of goods in possession of a surviving partner, and they had no alternative but either to suffer him to go on and sell on the usual terms and under a continuation of the confidence reposed in him by the intestate, or to divide the goods and sell the store of R. at auction." The vice chancellor thus approves of that case and of the distinction between it and the one before him, and on that distinction sustains his own decision as consistent with that case and with *Brown* v. *Campbell*, (*Hopkins*, 233.) This last case is also approved, on the same distinction, in the opinion delivered at the general term, by Justice Strong, affirming vice chancellor Parker's decision. He says (4 *Barb.* 647) " In *Brown* v. *Campbell* Chancellor Sanford sustained the *exchange* of the *notes* of the Union Cotton Manufactory for the *stock* of the Otsego Cot-

ton Manufactory. That however was not an original investment of money, but simply the *exchange* of one doubtful security for another, and might have been the best arrangement which could have been made."

This transaction, if the administrator had actively engaged in it, would have been only an exchange of one security or investment not approved by the courts, for another of the like nature, and generally considered at the time, equally safe, and would at that time appear a much better arrangement than a contest with the old bank for the payment of the testator's interest in the stock—a contest which probably could not end until all the claims against the bank had been settled ; and then (if an opinion entertained by many was correct, and the old bank was really insolvent) would have resulted in a total loss of the stock and the payment of heavy costs and counsel fees. In this case quite as much as in *Thompson* v. *Brown,* or in *Brown* v. *Campbell,* the administrator was justified in suffering the exchange of investments to be made, and ought not to be held accountable for any supposed loss that has resulted. He had no alternative but to suffer the change which at the time must have appeared expedient, or to enter into a controversy which probably would have resulted no better than the course which he adopted.

Could an executor be blamed who allowed his testator's shares in the stock of the chartered Chemical Bank to become part of the stock of the new bank under the general law. It is believed that an eminent lawyer, who held such stocks as executor threatened a suit against the new bank to compel it to allow him to come in and participate in its stock. Yet the banks are entirely distinct in interest. So it is believed that generally, when the charters of old banks have expired, their stock has been transferred to the new bank of the same name, unless express dissent was manifested ; and that such dissent seldom occurred. This shows that the administrator was guilty of no negligence in not interfering with the transfer that was made.

The bill should be dismissed; and as the administrator is not in fault and should not be subjected to the payment of his solicitors' costs, it is with costs.

[NEW YORK GENERAL TERM, May 7, 1855. *Mitchell, Clerke,* and *Cowles,* Justices.]