WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.
September, 1878.

## BAKER v. DISBROW.

*In the matter of the final accounting of* THOMAS L.
DISBROW *and* LIVINGSTON DISBROW, *executors,
etc., of* PHILENA DISBROW, *deceased.*

Where the executors and trustees under a will were authorized to sell real
estate, and directed to invest the proceeds upon bond and mortgage, or
other good security, and pay the income to certain minor children, but
bought with such proceeds real estate, which they subsequently re-sold
at a profit, and continued buying and selling real estate, the income
from which the *cestuis que trust* received, until finally the trustees lost
a large part of the fund, *Held* that the purchase of real estate was
unauthorized, but that the *cestuis que trust*, on becoming of age, could
not ratify the first transactions which resulted in a profit, and call upon
the trustees to account for the fund as so increased, from the date of
the increase, disavowing the subsequent transactions, and that the
trustees were only liable to account for the fund they had in their
hands before the purchase of any real estate, with interest from the
time when the *cestuis que trust* ceased to reap the benefit from the real
estate bought.

PHILENA DISBROW died in New Rochelle, in March,
1865, seized of a house and lot there, and possessed of
personal estate to the amount of $503.87. She left a
last will and testament, in and by which, after direct-
ing payment of her debts and funeral expenses, she
devised and bequeathed the use of her real and personal
estate to the children of her daughter, Cassandra
Baker, wife of Edward T. Baker, during the life of said
Cassandra Baker, and at her death, the real and per-
sonal property were to go to said children, share and
share alike. The executors were authorized and em-
powered to sell the real estate at any time, and to

" invest the proceeds of such sale on good bond and mortgage, or in or upon other good and sufficient security, as to the said executors, or executor, or the survivor of them, may seem proper," such proceeds, whether invested or not, to go and be disposed of in the same manner and in all respects as the real estate so sold would have gone under the will, if the same had remained unsold.

After paying funeral charges and debts, there remained of the personal estate $106.10. In April, 1866, the house and lot in New Rochelle were sold, and, after paying expenses, there remained in the hands of the executors the sum of $4,256.08, which was, at that date, the whole amount of the estate. The executors, from that time to April 1st, 1869, collected interest and made payments to Cassandra Baker, on account of her children; the fund in their hands at the last-named date having increased $51.50, being interest received and unapplied. On the last named day, the executors purchased a farm in the town of East Chester, on which Mr. and Mrs. Baker then resided with their children, using the whole of the money then in their hands, to pay for the same; the three brothers of Mrs. Baker, two of whom are the executors, each contributing $500 of his own money to make up the amount of the purchase money and to pay for needed improvements, which contributions they intended for the benefit of Mrs. Baker. In a few weeks the farm was exchanged for a house and lot in 11th street in the City of New York, the executors receiving, on the exchange, about $2,000; in June, 1870, the 11th street property was sold, when

the executors had in their hands, as the result of these operations, $9,449.86, of which $6,000 was on bond and mortgage.   Of this amount $3,000 was invested in a mortgage on property at Fordham; subsequently $1,000 more was advanced and they received a deed of it.   Then about $500 was advanced to purchase some chattels on and about the Fordham property for Mr. Baker, and to improve the property.   A portion of the Fordham land was, in 1871, exchanged for a farm in New Jersey, on which were two mortgages, one of $4,000 and the other of $6,000, and the executors paid about $2,600 in cash and assumed the payment of the mortgages.   In October, 1873, the rest of the Fordham property was sold for $2,500.

The executors paid interest on the mortgages on the New Jersey farm to the amount of about $2,600 in all, and in 1874, on a foreclosure of the second mortgage for $6,000 being threatened, they paid $2,000 of the principal, and in the same year paid a judgment of about $550, which had been obtained against Mr. and Mrs. Baker for the purchase-money of stock, etc., for the farm.   The holder of the second mortgage subsequently called for the balance due on it, when the wife of one of the executors took an assignment of it to herself, and afterwards foreclosed it, and the property was sold for less than the amount of the two mortgages, the plaintiff being the purchaser.   Up to the time of the exchange for the New Jersey farm, the fund is claimed to have increased, as shown by figures based partly upon estimates of values, to about $13,450.

The account filed in this matter showed that the

result of all the speculations was to diminish the fund, in the hands of the executors, to the small sum of $1,393.04, which embraced the amount realized on closing up the transaction relating to the New Jersey farm, and which is carried to the credit of the fund.

MARTIN J. KEOGH, *for the executors.*

The investment in the purchase of land was legal, and the executors, acting in good faith, are not liable to make good any losses, except such as result from negligence. (Schultz *v.* Pulver, 11 *Wend.,* 369; Lansing *v.* Lansing, 45 *Barb.,* 185; McRae *v.* McRae, 3 *Bradf.,* 199).

JOSEPH D. BAKER *and* TREADWELL CLEVELAND, *for Edward Baker and Philena D. Cornell, two of the children of Cassandra Baker, now of age.*

The trustees had no authority to purchase real estate; they could only invest in government securities or on bond and mortgage. (Ackerman *v.* Emott, 4 *Barb.,* 626; King *v.* Talbot, 40 *N. Y.,* 76). The trustees having, by improper and unauthorized speculations, increased the amount of the fund from $4,250 in April, 1866, to $13,449.86, in February, 1871, and subsequently lost the most of it, these children may now ratify the doings of the trustees up to the last date, disaffirm their acts which led to the loss, and hold them to account for the fund as it then stood. They must account for the fund and its increase up to that period, and cannot be allowed for any subsequent losses. (Ex parte Lewis, 1 *Glyn & Jameson,* 69; Robinson *v.* Robinson, 11 *Beavan,* 371; Jones *v.* Foxall, 15 *id.,* 388; Wiles *v.* Gresham, 2 *Drury,* 258; Robinett's appeal, 36 *Penn. St.,* 174; Kepler *v.* Davis,

80 *id.*, 153; *Perry on Trusts,* § 470 [2d ed.]; *Lewin on Trusts,* 742 [6th ed.]; Dimes *v.* Scott, 4 *Russ.,* 195; Gillespie *v.* Brooks, 2 *Redf. Surr.,* 349; Colburn *v.* Morton, 1 *Abb. Ct. App. Dec.,* 378; Heathcote *v.* Hulme, 1 *Jacob & Walker,* 122).

THE SURROGATE.—The preservation of the fund is the great underlying principle governing courts of equity in their dealings with trustees and trust estates. Subordinate to that are the well established rules that trustees shall not be called upon to supply any loss incurred while following the line of duty, nor be permitted to make anything by the increase of the fund. Upon these broad, equitable doctrines is based our statute relating to the responsibilities of executors in regard to the estates committed to their charge. The books are full of cases where equity judges have aimed to apply these general principles to states of facts as various as the cases are in number. Those facts may mislead, or confuse, but a careful consideration of them will show that the great effort, throughout, has been to attain the chief end—the preservation of the fund—with all its legitimate increase, for the benefit of those for whom the trust was created. These courts, while recognizing and yielding to well established principles, do not hesitate, when a novel state of facts is presented, to do substantial justice, even though it seem to be opposed by some rigid rule of law. They entertain appeals addressed to the conscience of the tribunal.

Among the doctrines well settled is that of the duty of trustees, when directed to invest upon real estate

or other good and sufficient security, to make such investments upon bond and mortgage, or in government securities.    On this subject it is sufficient to refer to the cases of Ackerman v. Emott (4 Barb., 626), and King v. Talbot, (40 N. Y., 76).    Certainly, the purchase of real estate is not authorized by the will.    It cannot be considered a "security."    It resulted from a disregard of duty in this respect, that after various profitable speculations in buying, selling and exchanging real estate, by which the fund was, up to a certain point, largely increased, the exact figures being regarded as immaterial, a large portion of it was entirely lost by the last investment made. These facts sufficiently demonstrate the wisdom of the established rule.

The chief question, therefore, to be considered is, what is the measure of the liability of the trustees. It is claimed that they must account for the largest amount to which the fund was increased, as the children, who have attained the age of twenty-one years, choose to ratify their proceedings up to that point, and must not be allowed to deduct anything for losses incurred thereafter.    The evidence discloses the fact that neither Cassandra Baker nor her children understood the will.    They seemed to suppose that Mrs. Baker had an estate for life in the fund, and were not undeceived until about the time of the commencement of this proceeding.    I am inclined to think the executors were laboring under the same error.    It would also appear that all the various transactions in real estate were entered into at the solicitation of Mrs. Baker; that she and her husband and children went

23

into possession of the various parcels, as they were from time to time acquired, and were permitted to enjoy the usufruct.

Under these circumstances, can the claim of the adult children be sustained ?   So far as my researches have extended, I have been unable to find any adjudication, either in England or in this country, covering the question.   Their learned counsel have referred me to many cases as sustaining their theory.   I have examined them with considerable care, and find them briefly as follows:

In *Ex parte Lewis,* (1 *Glyn & Jameson,* 69), real property of the bankrupt was offered to sale by auction in *two lots,* on different days, and both lots were bought in by the assignee, without the authority of the creditors.   Upon a re-sale there was a loss upon one, and gain upon the other.   The balance was in favor of the estate.

This was a petition, that the assignee might be personally responsible for the loss upon the lot which had been under-sold.   The Lord Chancellor (Eldon) held the assignee strictly to his bargain where it was advantageous, and responsible for the loss.

It appeared in Robinson *v.* Robinson (11 *Beavan,* 371), that the testator by his will gave and bequeathed to his executors all the residue of his personal estate, upon trust, with all convenient speed to collect, get in, and dispose of the same and convert it into money, and invest the net amount thereof, or continue the same, in or upon any of the Parliamentary stocks, or funds of Great Britain, or on real securities in England, at interest, and to pay the interest and dividends

to his son for life, remainder in trust for the son's children.

The testator died in 1837, possessed, among other things, of bank stock, London Dock stock, a sum due upon the bond of the trustees of the Surrey and Sussex roads, secured by a mortgage or charge upon the tolls and toll houses, and on a bond from the commissioners of sewers of Surrey and Kent. These investments had not been realized in due time after the testator's death, and the tenant for life had been permitted to receive the income. It appears that by the non-conversion, a loss had been sustained on the bank stock and sewer bonds; but a considerable gain had accrued on the London Dock stock. Lord Langdale, Master of the Rolls, held that the bonds were not " real security." He further said : " The question is, whether, where there are *several distinct transactions,* in some of which a loss has been incurred, for which the trustees are chargeable, and on others there has been a gain which the trustee has no right to claim for his own benefit, the court will set off the one against the other," and he held it could not be done.

Jones *v.* Foxall (15 *Beavan*, 388), lays down a doctrine well established, that trustees, when suit is brought, must account for profits they have made on trust funds invested contrary to the terms of the trust.

The facts in Wiles *v.* Gresham (2 *Drury*, 258), were as follows: By a marriage settlement in 1834 the husband gave a bond for £2,000 to the trustees, to be paid within six months of the marriage, to be left outstanding, with the consent in writing of the wife and husband, and to be called in with like consent. Another

debt of £4,000 was included in the settlement. The £2,000 was never got in. The husband became bankrupt in 1836. The trustees proved for the debt, but afterwards joined in a *supersedeas*, on the bankrupt guaranteeing to his creditors 16s. 6d. in the £. The other creditors were so paid; the trustees never took their composition. In 1838, the wife and husband gave a written consent that the debt should remain out on the husband's bond. No other consent was ever given. The husband was again bankrupt in 1847. In 1834, the trustees had, at the instance of the husband (*having no power to invest in the purchase of lands*), purchased copyhold land and buildings with part of the £4,000. The husband erected new and valuable buildings on the land at his own expense, increasing its value far more than £2,000. There was no evidence to connect this outlay with the discharge of the bond debt. *Held*, 1st, that the trustees were liable for not getting the money in before 1836, if there was no consent by the wife. 2d, that the wife's consent in 1838 was not retrospective. 3d, that the trustees could not be indemnified out of the increase of value of the land caused by her husband's outlay upon it, the vice-chancellor saying: "When there are *two separate funds* subject to trusts, and the trustees commit a breach of trust as to the one by which it is lost, I think it impossible to permit the trustees to say, 'we have improved the other fund, and that fund is bound to make up the loss of the other.' That I cannot hold. If the trustees have lost *one part* of the settled fund, they must answer for it, whatever may be the improvement of the other."

Robinett's Appeal, Donnelly's Estate, (36 *Penn. St.*, 174), determines nothing new. It simply reaffirms the well-established principle that all increase of trust funds shall be for the benefit of the *cestui que trust*, whether the increase arise from mixing the trust fund with the funds of the trustee and employing them in trade, or otherwise. It is at the option of the *cestui que trust* to take the profits arising from the trade or interest on the fund.

In Kepler *v.* Davis (80 *Penn. St.*, 153), a guardian, mother of the ward, had invested moneys belonging to him, with other moneys of her own, in real estate, and sold out and reinvested in other real estate, and the speculations were continued down to the time of the commencement of the action, at which time the trust fund had largely increased by these successful operations. It was very properly held by the court, that as these accumulations, when ascertained, clearly belonged to the *cestui que trust*, they could not be seized by a creditor of the husband of the trustee.

*Perry on Trusts*, (§ 470, 2d. ed.), condenses the *dicta* of the various authorities on this subject as follows: "If the trust fund was properly invested, according to the trust instrument or according to law, and the trustee improperly converts the fund into money and neglects to invest it, or invests it improperly, or uses it in trade, business or *speculation*, the *cestui que trust* may, at his election, take the dividends or interest which the fund would have produced, if the investment had been suffered to remain where it was properly made, or he may take legal interest on the fund, or he may take all the profits that have been

made upon the fund. If the *cestui que trust* elect to take profits, he must take them during the whole period, subject to all the losses of the business. He cannot take profits for one period and interest for another;" and for this he cites Heathcote v. Hulme (1 *Jacob & Walker*, 122).

*Lewin on Trusts* (742, 6th Ed.), refers to the case of Wiles v. Gresham (above).

In Dimes v. Scott (4 *Russ*, 195), the testator had left the use of property to a person for life, directing the trustees to convert it into money and invest the proceeds in government or real securities, with remainder to another person. Part of the property had been invested by the testator in his life time in what was called the decimal loan, which yielded ten per cent. The trustees failed to convert that part, but received and paid the ten per cent. to the tenant for life. The Lord Chancellor (Lyndhurst) held that the property should have been converted, and that the life tenant was entitled to the income of the kind of stock which the court recognized as a proper investment, and which yielded only three per cent., and that the residue of the ten per cent. belonged to the legatee in remainder. It was, therefore, held that the trustees must be charged with the difference, and could not be allowed the benefit of that difference.

In Docker v. Somes (2 *M. &. K.*, 664), Lord Brougham says that in cases of separate appropriations there was no difficulty, as where land and stock had been bought and then sold again at a profit, and there was no hesitation in at once making the trustee account for *the whole gains he had made*.

It will be observed that in each of the cases of Ex parte Lewis, Robinson v. Robinson, Wiles v. Gresham and Docker v. Somes, there were separate and distinct investments of portions of the whole fund when they came into the hands of the trustees or such were made by them, and those cases are, therefore, applicable only where such facts exist. But here the whole fund entered into each transaction. The case of Docker v. Somes is cited and appended in a note in 1st Story's Eq. Jurisp., § 465 (10th Ed.), to sustain the text, which is this: "The general idea seems to run through all the cases that the trustee is never permitted to make any profit to himself." The cases of Jones v. Foxall, Robinett's Appeal, Kepler v. Davis, Dimes v. Scott, Gillespie v. Brooks and Colburn v. Morton, while, doubtless, sound in principle, establish no new rule, and are inapplicable to the question under consideration. All of the authorities referred to relate to the condition of the estate or funds as they existed at the time when the questions arose. Hence the question concerns a pre-existing state of affairs. There the profits were in the hands of the trustees at the time of the litigations. Here they, together with most of the principal, have long since disappeared. It is impossible for the *cestuis que trust* to elect to take the Fordham property and such money as was then in hand; and even if they could exact the estimated value of the Fordham land, it would have to be based upon its present value, of which there is no evidence.

It is true these children, on coming of age, would, if the condition of the fund permitted, have the option to repudiate the purchase of the various parcels of

land and claim the fund and interest. (Eckford *v.* De Kay, 8 *Paige*, 89.) But they cannot now exercise the right, because, as just shown, the trustees now have, as such, no real estate. It is also true that Edward Baker and Mrs. Cornell came of age while the trustees held the New Jersey farm, but they were in ignorance of their rights and could not then have made an election which would have been binding upon them. They simply remained passive, and their silence cannot be construed into acquiescence. (Pinckney *v.* Pinckney, 2 *Richardson's Eq.*, 219; and see Green *v.* Green, 69 *N. Y.*, 553.)

The case of Heathcote *v.* Hulme (1 *Jacob & Walker*, 122), decided by Sir Thomas Plumer, Master of the Rolls, in 1819, more nearly resembles this than any other which has come under my notice, and yet it fails to meet the precise question under discussion. The fund, belonging to minors, was employed by those having the control in trade, which was conducted in a certain firm name. After the lapse of some years, there was, in 1801, a change in the firm name, but the fund continued to be used in the same trade by the new firm, for what period does not appear, but doubtless for at least ten years. It was understood that it was so employed for the benefit of the minors and at the request of their friends. On attaining full age, some of the children commenced an action, claiming that they were entitled to the profits made on their shares down to 1801, and to interest from that time. This would indicate that the profits had been more than the interest down to 1801, and after that period a loss had been incurred, or less than interest earned, but

the facts are not clearly disclosed in the report of the case. The Master of the Rolls held, that if nothing had happened to make any break in the period during which the application of the capital to trade continued, the demand could not be sustained; that the plaintiffs must make their election, *utrum horum,* which rule of account they would adopt (namely, to take the profits or the interest), but that they could not proceed by both; and he declared that, after the whole period was over, they had a right to determine which mode of accounting would be most advantageous to them, and to that they must adhere. The principle of the option given is, that the party elects whether he will ratify the employment of his capital, and, if he does, he may take the profit, but he must also be subject to the loss. He also says that circumstances might occur during the carrying on of the trade to divide the period, but does not indicate his views as to the effect of such division.

Here it must be borne in mind that the fund was continually employed in the purchase, sale and exchange of real estate from 1869 to 1871, covering the period at which these *cestuis que trust* propose to stop and demand the profits. Then the investment was made which proved so disastrous to the fund. The novelty of the claim made is against it. The trustees have certainly reaped no benefit to themselves, and I can discover no lack of good faith in any of their proceedings. In such case they are treated, in equity, with great tenderness. (Thompson *v.* Brown, 4 *Johns. Ch.*, 619.)

It seems to me that, under the circumstances pre-

sented, it would be extremely inequitable for this or any court to comply with the demand made. Where will persons be found willing to act in fiduciary capacities, if they are to be thus treated ? True, they have proceeded illegally in the matter, but with entirely honest intentions, and they should not be punished to the extent sought. The most that can properly be done is to compel them to account for the fund they had in their hands before the purchase of any real estate, with interest from the time when these claimants, respectively, ceased to reap any benefit from the New Jersey farm. No interest anterior to that time is allowed, as they were, as already stated, in the enjoyment of the use.

The costs and expenses of the proceeding will be paid out of the fund.

Decree accordingly.