WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.
November, 1878.

## BATES v. UNDERHILL.

*In the matter of the final accounting of* GEORGE W.
C. UNDERHILL, *surviving executor, etc., of* PETER
BATES, *deceased.*

An executor and trustee under a will is liable for a portion of the trust
fund, not invested as directed in the will, but retained, and misappro-
priated by his co-trustee.*

Where the defaulting trustee had been a former attorney of the decedent,
and confided in by him, and of good standing and reputed wealth, and
had represented to his co-trustee that he had properly invested the
portion of the fund in his possession, *Held* that the co-trustee, though
liable therefor, should be charged with simple interest only thereupon.

Where the testator devised a farm upon which there was a mortgage, to his
executors and trustees, and directed them to pay the rents to one
whom they allowed to occupy it instead, *Held* that the taxes, charges
and interest on the mortgage should be paid by the occupant, and
should not be allowed, in the executors' accounts, as a charge against
the estate.

THE testator died in 1862, seized of a farm, called
the homestead, consisting of about 100 acres, and also
of another parcel of land, containing about sixty
acres, known as the quarry farm. He also left assets

---

* In PAULDING v. MARVIN [decided Kings County, HON. A. H. DAILEY,
Surrogate, August, 1878,] it was held that an executor, not a trustee
under the will, who paid the proceeds of a sale of property belonging
to the estate to his co-executor, who was a trustee, for investment
according to the terms of the trust, was not liable to the estate for a
subsequent misappropriation of the fund; and that a third co-executor
who was also a trustee under the will, but who never had possession of
the money, was not actively engaged in the business of the trust, and
who testified that he did not know that it had been retained by the
defaulting trustee, but believed that it had been invested in a particular
bond and mortgage, as agreed upon by the trustees, was also not
chargeable for the waste.

amounting, as shown by the inventory, to nearly $11,000. By his will, which was admitted to probate in January, 1863, he devised the homestead farm, situated in East Chester, together with the stock and farming utensils thereon, to his executors, in trust, to receive the rents, issues and profits thereof and apply the same to the use of his brother, Alfred S. Bates, during his life, and at his death, then in trust for certain other purposes, remainder in fee, on certain contingencies to others. He bequeathed to his executors $6,000, in trust, " to invest and keep the same invested upon bond and mortgage of real estate, and apply the interest arising therefrom to the use of his brother, Thomas Bates, during his life, and after his death to pay and divide $3,000 thereof to and among all the children of his deceased brother Gilbert, and of his sisters Jane and Ann Eliza that should then be living, share and share alike, *per capita ;* and to pay and divide the remaining $3,000 to and among the children of his brother, Alfred S., that should then be living, share and share alike. He then gave his executors $1,000, in trust, to invest in like manner for the benefit of Mary Kellogg, a faithful servant, during her life, and at her death to pay and divide the principal sum equally to and among the children of his brother, Alfred S., who should then be living. The residue of his estate, real and personal, he devised and bequeathed to the children of his said brother, Alfred S., equally. He appointed Smith Barker and George W. C. Underhill executors of the will.

The household furniture, stock and farming utensils, amounting in value to $2,163.87, as shown by the

inventory, were delivered to or passed at once into the hands of Alfred S. Bates, who, at the same time, entered into possession of the homestead farm and has so continued to the present time. The executor Barker was indebted to the testator at the time of his death in the sum of $7,050 and interest, evidenced by promissory notes and an interest-bearing receipt. Among the assets was a note of $600, given by David Palmer; also a note of George Trace for $30; a book account against John Cornell of $182.09; cash, in bank bills and coin, $448; and a pass-book showing a deposit in the Bowery Savings Bank of $264.64. The evidences of Barker's indebtednes, the bank bills and coin, and the pass-book, were, at the time of the taking of the inventory, delivered to the executor Underhill. The Palmer and Trace notes and the book account went directly into the hands of the executor Barker, and, on or about February 17, 1872, Underhill delivered the savings bank pass-book to him, so that he ultimately had in his possession, including what he owed the estate, $8,126.73, besides the interest due upon his indebtedness. He died in June, 1872, insolvent. It does not appear that the several trust funds were invested during his life, as directed by the will. Thomas Bates died in May, 1836, and Mary Kellogg, January 20, 1876, the surviving executor having invested the fund of which she was entitled to the interest in May, 1874, out of the sum of $1,305.47 which he had recovered from the administrator of Barker in that year.

From Barker's book it appears that the only charge he made against himself for moneys received, was

$480.22, from the Bowery Savings Bank.   He has not
credited himself with any investment made by him,
nor charged himself with any income received.

One Bowne held a mortgage of $1,000 upon some
of the real estate of the testator, on which the execu-
tors paid interest for several years.   They also paid
taxes on the land, or furnished the money for that
purpose.

Barker was the counsel of the testator, was largely
entrusted by him with the conduct of his affairs, and
was in good credit.   Underhill confided in Barker,
and permitted him to have the chief management of
the estate.   On two or three occasions he asked
Barker if the funds were invested, and was told by
him that they were, and he was making payments out
of them.   It appears that, after the death of Thomas
Bates, he paid to the children of Gilbert, Jane and
Ann E., their half of the $6,000 fund.

Henry W. Bates, the petitioner, was a son of said
Alfred S. Bates, and as such claimed one-tenth of the
half of the $6,000 fund; one-eleventh part of the
$1,000 fund; and also his like share of the residuum,
with compound interest.

HENRY W. BATES, *in person;* A. B. CRANE, *of counsel.*

WM. H. PEMBERTON, *for the executor.*

THE SURROGATE. — While the surviving executor
has, doubtless, intended to discharge properly the
duties of his trust, there has been gross mismanage-
ment of the estate on the part of his co-executor.   It
is sought to hold the former liable for the loss occa-
sioned thereby.   His counsel seeks to shield him from

such liability by invoking the familiar rule that one executor shall not be answerable for the *devastavit* of his associate, unless he shall have, in some way, contributed to it.   That rule is applicable to simple executors.   Here, however, the executors were also constituted trustees of an active trust.   As to them, a more stringent rule, it seems, is applied in a case like this by the English Court of Chancery, and I see no reason why it should not be enforced in this country, although I am referred to only one American authority on this subject, and that not of this State.

In Styles *v.* Guy (1 *Macn. & Gord.*, 422), it was held that an executor would be answerable if he left the money for two years in the hands of a co-executor, where, by the terms of the trust, it ought to have been invested on proper security, and this, even where it consisted of a debt due from him to the testator.   The court further held that it was the duty of the other executor to have recovered the debt from the defaulting executor, as from any other debtor to the estate, and it had been neglected to be done for a period of six years in that case.   So in the case of Brice *v.* Stokes (11 *Vesey*, 319), the court held the liability of a trustee fixed, if he permit the money to remain in the hands of his co-trustee, however competent and responsible, longer than is necessary.   In Egbert *v.* Butter (21 *Beav.*, 560), it appeared that Warwick Hunt, Butter and Oxenham were appointed executors.   Hunt was permitted by his co-executors to possess himself of the whole personal estate, without making any provision for an annuity to Egbert, the plaintiff, provided by

the will.   The other executors were held, by the Master of the Rolls, to be liable for Hunt's receipts. In Wiegand's Appeal (28 *Penn. St.*, 471), the doctrine laid down in Styles *v.* Guy (above), was approved. The testator bequeathed to a daughter the interest accruing on a bond, owing by one of the executors, annually, for life, and directed the principal to be secured by the executors.   The obligor became insol-, vent and died, eighteen years after the death of the testator, without any steps having been taken by the other executor to have the amount secured.   The court held that it was a joint duty, and that the sur- viving executor was liable to make good the loss.

But here the executor seeks to escape from liability on the ground that Barker was considered an honest man, and a person of reputed wealth; that he con- fided in him, and believed his statement that the funds were properly invested.   However these facts may tend to exonerate him from moral censure, the courts in England have held them otherwise insufficient. Sir John Romilly, Master of the Rolls, in Thompson *v.* Finch (22 *Beav.*, 316), held that where money to be invested was in the hands of a co-trustee, and the defendant was told by him that the money was prop- erly invested, when it was not, it was no justification; that it was his duty to see that the money was invested according to the trusts which he had undertaken to perform, and held him liable for the fund.   Hynard, the defaulting executor, was a solicitor of great repu- tation, and universally respected, at the time he in- formed his co-executor he had the fund invested; and the Master of the Rolls says: " Probably everybody

trusted Hynard, who was then in good circumstances and credit, and Finch (the other executor) believed that everything had been properly done ; but that does not exonerate him." Barker, too, was an attorney in good standing and credit, and doubtless Mr. Underhill placed full reliance upon his assertion that the funds were invested ; " but that does not exonerate him."

The counsel for the executor contends that his client should not be held responsible, because there was no mode by which he could recover of Barker what he owed, as one executor cannot sue another, and refers me to Decker *v.* Miller (2 *Paige*, 149), as an authority to sustain this view. I find nothing in the case to justify the reference, but in a *note*, appended by the editor of the second edition, some cases at law are cited to that effect. It was so held in the case of Gardner *v.* Miller (19 *Johns.*, 188), where the court says ; " *At law*, all the executors are required to represent the testator, and all must join as plaintiffs in an action," and hence one could not sue another ; but that very case in Paige shows that an executor could file a bill against another in chancery. It is just such a case as this, where courts of equity will interpose and compel a reluctant or negligent trustee to do his duty. The same objection was raised in Wiegand's Appeal (above), but the court did not sustain it, because the executor might have made application to the Orphan's Court, which could have compelled the other executor to secure his debt, upon pain of dismissal from his office as executor. If there were any doubt as to the power of this court to take action on the subject, it was, I apprehend, removed by the Act of

1867, which conferred upon it the power to compel an accounting by testamentary trustees. On such accounting, on its being made to appear that the executors had funds uninvested, which it was their duty under the will to invest, it would be competent for this court to decree it to be done, and to enforce obedience in the usual way. It would be strange, indeed, if no court possessed the power to afford adequate redress.

The cases of Sutherland *v.* Brush (7 *Johns. Ch.*, 17), Manahan *v.* Gibbons (19 *Johns.*, 109, 427), Brown's Accounting (16 *Abb. Pr.*, [*N. S.*], 457), and others cited by the executor's counsel seem to me inapplicable to the facts of this case.

The interest on the Bowne mortgage and the taxes due and payable at the testator's death were properly payable out of the estate, but after that any payments made by the executors on those accounts must be disallowed. Had the farm been devised to Alfred S. Bates for life, he, as life tenant, would have taken the estate *cum onere*. It can make no difference that he was *cestui que trust*. The trustees, had they rented the farm, as was intended, should have first paid the interest and taxes out of the rents, issues and profits, and paid the residue to him. They had no right to pay them out of the general fund. I understand the rule to be that, when an annuity is given, the whole amount must be paid to the annuitant, free from taxes, charges and commissions; but when the use of a fund or property is given, it is subject to such charges. I assume that the Bowne mortgage was upon the homestead farm; but if it was upon the quarry farm, then the burthen of paying the interest,

as well as the taxes thereon, was upon the devisees of that farm.

From the account filed and the testimony, I find that the executor has in his hands, irrespective of the half of the $6,000 fund and interest, $462.40, besides the $1,000 invested in the Gould mortgage, for the benefit of Mary Kellogg, with interest thereon since her death. Aside from this cash balance, in view of the authorities quoted, and not forgetting the fact that this applicant was, during most of the period since the death of Thomas Bates, a minor, I feel constrained, however reluctantly, to hold him liable for the share of the petitioner in the $3,000, with simple interest thereon, from the time of the death of Thomas Bates, and also his share of the $1,000 fund and simple interest thereon from the date of the death of Mary Kellogg, less his commissions. On the authority of Garniss v. Gardiner (1 *Edw. Ch.*, 128), Ackerman v. Emott (4 *Barb.*, 626), I must decline to charge the executor with compound interest. I am not unmindful of the rule adopted in King v. Talbot (40 *N. Y.*, 76), but it was laid down in view of the facts of that case, which are very different from those existing here. The learned judge delivering the opinion declares that the rate of interest rests in a discretion that permits the consideration of all the circumstances. So, as to whether simple or compound interest shall be allowed rests, as I conceive, in a like discretion. No inflexible rule can safely be established to meet the exigences of every case.

As already stated, these executors were acting in a dual capacity. As to the homestead and the two funds

to be invested, they were trustees; as to the residuum of the estate, they were simply executors. Hence we shall have to adjudicate concerning their conduct and transactions according to the rules applicable to them as executors, only in so far as the assets belonging to the residuary estate are in question. The surviving executor claims to have paid out, in the due course of administration, all of the assets received by him, yet I find in his hands, as above shown, $462.40, in which is included the sum of $305.47, being the residue of the money recovered from Barker's estate after investing $1,000 for the benefit of Mary Kellogg. He did not deliver to Barker the assets taken by him at the time the inventory was made. He was merely passive. For the loss of those funds he is, therefore, not liable. ( *Williams on Exrs.*, 1651.) But he did, on or about February 17th, 1872, deliver to him the savings bank book, long after he supposed Barker had invested the trust funds. For the amount then due from the bank ($480.32) he must be held accountable, with interest. The cash balance in the hands of the executor, to the extent of $305.47, I consider justly applicable to the liquidation of the $3,000, parcel of the $6,000 fund. The residue of the balance, $156.93, must be accounted for by the executor, with interest from April 4th, 1864, it being about the amount of interest improperly paid on the Bowne mortgage. The $50 paid to counsel in aiding to recover from Barker's estate the money due from him I regard as a proper charge. Other questions raised I deem it unnecessary, from my view of the case, to determine.

The result then is, that the executor is liable to the

petitioner for his respective shares of the trust funds and interest; for his share, as residuary legatee, of the $480.22, the amount of the *devastavit* of the Bowery Savings Bank money, with simple interest thereon from February 17th, 1872, and also for his like share of the $156.93, with interest, less commissions.

A decree will be entered accordingly, without costs to either party as against the other, and without any allowance to the executor for services of attorney in this accounting, but the stenographer's fees will be paid out of the estate.